**EARTH ISLAND INSTITUTE, a California nonprofit corporation; the Marine Mammal Fund, a California corporation, and David R. Brower, Plaintiffs,**

**v.**

**Robert MOSBACHER, Secretary of Commerce; Dr. John Knauss, Administrator of the National Oceanic and Atmospheric Administration; Dr. William W. Fox, Jr., Assistant Administrator, National Marine Fisheries Service; and Nicholas Brady, Secretary of the Treasury, Defendants.**

**American Tunaboat Association; Joseph J. Medina, Jr., and Manuel A. Silva, Intervenors–Defendants.**

**No. C–88–1380–TEH.**

United States District Court, N.D. California.

Aug. 28, 1990.

Wondie Russell, Wayne S. Braveman, Joshua R. Floum, Cynthia L. Koehler, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs.

Richard B. Stewart, Asst. Atty. Gen., James C. Kilbourne, Charles R. Shockey, Attys., Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants.

C. Hugh Friedman, Lorenz, Alhadeff, Lundin & Oggel, San Diego, Cal., David G. Burney, John A. Hodges, Wiley, Rein & Fielding, Washington, D.C., August J. Felando, San Diego, Cal., for intervenor-defendant American Tunaboat Ass'n.

## ORDER FOR PRELIMINARY INJUNCTION

THELTON E. HENDERSON, District Judge.

This matter comes before the Court on Plaintiffs' motion for preliminary injunction. Plaintiffs seek to enforce various provisions of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 et seq., particularly those relating to the protection of dolphins. Specifically, plaintiffs ask the Court to enforce provisions of the statute which they claim require a ban on the import of tuna from foreign nations until such time as certain findings regarding incidental dolphin takings are made.

Plaintiffs' motion came on for hearing on Monday, Aug. 20, 1990. After considering the parties' written and oral arguments, it appears to the satisfaction of the Court therefrom that plaintiff's motion for a preliminary injunction should be GRANTED in part and DENIED in part and that, unless a preliminary injunction is granted, plaintiffs may suffer irreparable injury before the matter can be brought to trial.

### PARTIES

1. Plaintiff Earth Island Institute is a California non-profit corporation with its principal place of business in San Francisco, California. It is a national organization whose members share a commitment to the protection of marine mammals.

2. Plaintiff The Marine Mammal Fund is a California non-profit corporation with its principal place of business in San Francisco, California. Its charter is to sustain and enhance the ocean ecology with an emphasis on the survival of marine mammal species.

3. Plaintiff David R. Brower is a resident of Berkeley, California.

4. Defendant Secretary of the United States Department of Commerce is charged by law with the responsibility of enforcing all aspects of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 et seq. (MMPA); in this regard, he is also responsible for the actions of the National Oceanic and Atmospheric Administration (NOAA) and the National Marine Fisheries Service (NMFS).

5. Defendant Administrator of the NOAA is allegedly authorized to carry out functions described in the MMPA.

6. Defendant Assistant Administrator of the NMFS is allegedly authorized to carry out functions described in the MMPA.

7. Defendant Secretary of the United States Treasury Department is charged with certain duties in relation to enforcement of the MMPA pursuant to Section 1371(a)(2) of the MMPA, especially as regards banning the importation into the United States of certain commercial fish and fish products.

### INTRODUCTION

Yellowfin tuna, which are one of a number of tuna species caught for food, are commonly caught with purse seine nets. Purse seines are large nets which are manoeuvered around the fish by means of floats and weights and which are then closed like a purse upon the fish trapped inside.

In the Eastern Tropical Pacific Ocean (ETP), a five to seven million square mile area of ocean stretching from Southern California to Chile and extending west for nearly three thousand miles, schools of yellowfin tuna often associate with herds of dolphin and the two groups move together as they forage for food. The dolphins swim in the upper levels of the ocean where they are visible as they break the surface to breathe and leap into the air. The tuna forage below the dolphin in the deeper water. The result of this relationship is that the tuna fishing fleets from several nations, including the United States and numerous South and Central American nations such as Mexico, Ecuador, Panama and Venezuela, take advantage of this natural phenomenon by pursuing the visible dolphin herds in order to locate schools of yellowfin tuna possibly below.

Due to the association between dolphins and yellowfin tuna, fishing vessels often set their purse seine nets on dolphins in order to catch the tuna. In this process, referred to as "setting on dolphins," the air-breathing dolphins are intentionally chased and deliberately encircled in the nets in order to catch the yellowfin tuna which may be below. To expedite the process of closing the nets into a circle, the tuna fishermen and women sometimes use explosives and chase boats to drive the dolphins into the center of their nets. Setting on dolphins often results in the death and maiming of some or all of the dolphins entangled in the nets. Dolphins not immediately killed may later die from serious injuries. The dolphin population in the eastern tropical Pacific has fallen significantly in the last twenty years, and at least one sub-species has fallen below the level needed to sustain the population.

*Marine Mammal Protection Act*

In order to curb the worst excesses of the practice of "setting on dolphins," and to save the lives of dolphins and other marine mammals, harmed in this and other manners, Congress in 1972 enacted the Marine Mammal Protection Act (MMPA). Amendments to the MMPA were enacted in 1981, 1984 and 1988. The Act proclaimed an "immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). To achieve this goal, Congress, in Sections 1373 and 1374 of the Act granted the Secretary of Commerce broad powers to promulgate and enforce regulations designed to insure realization of the Act's objectives.

*The MMPA and the United States tuna fishing fleet*

In order to set on dolphins, the American Tunaboat Association receives a general permit. This general permit is the mechanism by which the United States fleet can be given permission to intentionally pursue, capture and kill dolphins in the course of its commercial tuna fishing operations.

Absent the permit, this conduct is absolutely proscribed under the MMPA. In 1980, an absolute ceiling on dolphin mortality of 20,500 was included in the "general permit" issued to the American Tunaboat Association. This limit was later incorporated into the NMFS regulations implementing the Act and codified in the Act itself. In 1981, Section 1371 of the Act was amended to provide that:

> [the] goal, [of zero mortality] shall be satisfied in the case of the incidental taking of marine mammals in the course of purse seine fishing for yellowfin tuna by a continuation of the application of the best marine mammal safety techniques and equipment that are economically and technologically practicable.

Subsequent to the enactment of the MMPA, various dolphin-saving measures have been researched and implemented by the United States tuna fishing fleet and the American Tunaboat Association. On January 17, 1989, this Court, relying upon a provision of the MMPA, granted plaintiffs' motion for a preliminary injunction requiring that all United States certificated tuna vessels fishing within the Eastern Tropical Pacific must have a certified observer on board for the observation of fishing operations, unless for reasons beyond the control of the Secretary of Commerce, an observer is unavailable.

*The MMPA and the foreign tuna fishing fleet*

Today this Court addresses provisions of the MMPA which apply to the foreign tuna fishing fleet. The killing of dolphins by foreign tuna fleets has been the object of intense Congressional concern for almost two decades. The Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 et seq., as originally enacted directed the Secretary of the Treasury to "ban the importation" of commercial fish or fish products caught with "technology resulting in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2).

In 1984, concerned that the NMFS was not holding foreign vessels to Unites States dolphin protection standards, Congress

amended the MMPA to lessen the agency's discretion, and established stringent and specific restrictions on foreign nations seeking to import tuna into the United States. Under the 1984 amendment to § 101 of the MMPA, tuna harvested with purse seines in the eastern tropical Pacific Ocean (ETP) can be imported only upon a demonstration by the government of the foreign nation that it: (1) has in place a "comparable" regulatory program to that of the United States fleet for protecting dolphins from commercial fishing operations; and (2) has an average incidental marine mammal taking rate "comparable" to that of the United States fleet. 16 U.S.C. § 1371(a)(2)(B).

A full four years after the 1984 MMPA amendments were enacted, the NMFS had only issued "interim final" regulations regarding the importation of tuna taken in association with dolphin kills. Moreover, these rules would have allowed foreign nations until 1991 to comply with the statute. Congress spoke to this issue by amending the MMPA to require foreign fleet compliance with certain of the comparability requirements by the end of 1989. On November 23, 1988, the President of the United States signed into law the Congressional amendments to the MMPA.

Congress was clearly concerned that its efforts to improve the fishing practices of the United States fleet would be undone by the fishing excesses of the foreign fleet. Senator Breaux stated at the Hearings on Reauthorization of the MMPA:

> The program is working in the United States. The problem is not with our tuna industry. The problem is with the foreign fishermen, who take four times more porpoises than our industry does . . . And even equally as bad, our government has not done anything about it. We gave them the authority to say that exports to the United States would be restricted if the foreign fleets do not do something about the problem. And what has our government done? They

have not even issued the regulations to institute the program Congress passed. That was four years ago. And the real question is where are the regulations? What are they waiting for?

> Opening statement of Senator Breaux, S. Hrng. 100–711, Hearings on Reauthorization of the MMPA at 4 (April 13, 1988).

The record is replete with references to the "foreign fleet problem." See, e.g., 134 C.R.H. 8243 (September 26, 1988) (Rep. Young: "It is important to remember that it is the greatly increased mortality caused by foreign tuna boats which is responsible for most of the porpoise deaths.").

Congress clearly believed that banning the importation into the United States of tuna caught by foreign nations with incidental marine mammal taking rates in excess of United States rates would help to protect the dolphin population. Congress believed that the ban would encourage foreign fleets to adopt dolphin-safe practices. It is also clear that such regulations would help to protect United States fishermen and women from unfair competition from the vessels of foreign nations which engage in fishing practices which may be less expensive, but which result in much higher dolphin kill rates.

The 1988 amendments to the MMPA which this Court addresses today were designed to address the "foreign fleet problem." The amendments were designed to limit agency discretion to determine "comparability" as to the incidental taking rate of foreign nations to that of the United States fleet by establishing precise and clear standards for these determinations. Despite the fact that the 1989 fishing season[1] has come and gone, and that we are now nearly nine months into the 1990 fishing season, no comparability findings have been made based on the 1988 amendments to the MMPA which are at issue today. It is on the basis of these facts that the Court grants this preliminary injunction.

---

**1.** Since yellowfin tuna fishing occurs year round, this Court has held that the fishing season is coextensive with the calendar year.

ANALYSIS

■ It is well established in this Circuit that a preliminary injunction is appropriate where plaintiffs demonstrate either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in their favor. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir.1988).

Plaintiffs seek a preliminary injunction based on the defendants' alleged noncompliance with two provisions of the MMPA. We hold that the plaintiffs have demonstrated a likelihood of success on the merits with regard to one of the two provisions, as well as a possibility of irreparable injury, and that a preliminary injunction should therefore issue.

LIKELIHOOD OF SUCCESS ON THE MERITS

The Court will address separately the two MMPA provisions upon which plaintiff primarily relies.

This matter focuses on certain provisions of 16 U.S.C. § 1371, which this court has already addressed when we denied plaintiffs' motion to require observers on all tuna boats of a foreign nation in order for that nation to import tuna to the United States. Today we GRANT plaintiffs' motion that no foreign nation may import tuna into the United States unless the Secretary of Commerce first finds that the average rate of incidental taking by vessels of the harvesting nation is no more than 2.0 times that of United States vessels during the same period.

We DENY plaintiffs' motion to ban the import of tuna from foreign countries unless and until the Secretary of Commerce finds that the total number of eastern spinner dolphins incidentally taken by vessels of the harvesting nation during the 1989 fishing season did not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year and the total number of coastal spotted dolphin incidentally taken by such vessels in the 1989 fishing season did not exceed 2 percent of the total number of all marine mammals incidentally taken by such vessels in that year.

*incidental taking rates*

■ The statute orders the Secretary of the Treasury to ban the importation of yellowfin tuna caught with purse seines by vessels of foreign nations unless and until the Secretary of Commerce makes a positive finding that the average incidental taking rate of marine mammals by a given nation wishing to import yellowfin tuna is "comparable" to the average rate of United States vessels. The 1988 amendments establish guidelines for what may be deemed "comparable." It is clear that as of the end of 1989 the statute forbids a finding of "comparable," and therefore forbids imports, for any nation whose vessels have an average incidental marine mammal taking rate which exceeds 2.0 times that of United States vessels. Similarly, as of the end of 1990, the Secretary of Commerce may not make a finding of comparability unless the average taking rate of the foreign nation does not exceed 1.25 that of United States vessels. The relevant standard of comparability remains 1.25 from the end of 1990 forward. Nations which demonstrate to the Secretary that their taking rates fall within the relevant standards may import purse seine-caught yellowfin tuna into the United States.

The statute reads in relevant part:

[1] The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For purposes of applying the preceding sentence, the Secretary—

\* \* \* \* \* \*

[2] (B) in the case of yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean, and products therefrom, to be exported to the United States, shall require that the government of the exporting nation provide documentary evidence that—

\* \* \* \* \* \*

[3] (ii) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of marine mammals by United States vessels in the course of such harvesting,

[4] except that the Secretary shall not find that the regulatory program, or the average rate of incidental taking by vessels, of a harvesting nation is comparable to that of the United States for purposes of clause ... (ii) of this paragraph unless—

 *  *  *  *  *  *

[5] (II) the average rate of the incidental taking by vessels of the harvesting nation is no more than 2.0 times that of United States vessels during the same period by the end of the 1989 fishing season and no more than 1.25 times that of United States vessels during the same period by the end of the 1990 fishing season and thereafter;

16 U.S.C. § 1371(a)(2), (numbers in brackets added for reference).

Clause [1] establishes as the *status quo* a ban on importation of "commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." The final sentence of clause [1] explains that the subsequent clauses describe how to "apply[ ] the preceding sentence [the import ban]."

Clauses [2] through [5] explain how the statutory ban can be overcome by foreign nations that wish to import purse seine-caught yellowfin tuna into the United States. Clause [2], provides that in order to overcome the import ban, foreign governments must provide certain documentary evidence to the Secretary of Commerce.

Clause [3] states that the documentary evidence which clause [2] requires must show that the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of marine mammals by United States vessels in the course of such harvesting. If the Secretary of Commerce is able to determine from the information submitted by a given foreign government that the average marine mammal taking rates of the vessels of the foreign country are "comparable" to those of United States vessels, then the import ban may be overcome. The statute clearly places the burden of production on the foreign nation seeking to import tuna, which provides an excellent incentive for the speedy production of evidence.

Clauses [4] and [5] establish guidelines, which become operative "by the end of 1989," as to what the Secretary may deem to be "comparable." The "comparability" guidelines state that as of the "end of the 1989 fishing season" the Secretary of Commerce may not make a finding of "comparable" for a foreign nation unless the documentary evidence provided shows that the incidental taking rate for vessels of the foreign nation "is no more than 2.0 times that of United States vessels during the same period ..." Without a finding of "comparable" for vessels of a given foreign nation, imports of yellowfin tuna caught with purse seines in the ETP by the vessels of that nation are forbidden. Clause [5] establishes similarly that "by the end of the 1990 fishing season," the comparability standards become even more stringent. As of the end of 1990 the Secretary of Commerce may not make a finding of "comparable" unless the foreign government demonstrates that its average marine mammal incidental taking rate is no more than 1.25 times that of the United States fleet.

Under the terms of the statute, a given foreign government could have provided evidence which would have allowed the Secretary to find that its average marine mammal incidental taking rate was no more than 2.0 times that of the United States *before* the end of 1989, and could have thereby avoided the import ban altogether. Furthermore, until the end of 1990, the 2.0 times showing is sufficient to allow the Secretary of Commerce to deem the taking rate "comparable," for purposes of overcoming the import ban.

Similarly, a given foreign government may provide evidence which allows the Secretary to find that its average marine mammal incidental taking rate is no more than 1.25 times that of the United States *before* the end of 1990 and may thereby avoid the ban at the end of 1990, after which time the Secretary may not deem a taking rate to be comparable unless it meets the 1.25 times standard. Any time after the end of 1990 the import ban may be overcome only by a finding that the 1.25 times standard has been met.

The defendant argues that "by the end of the 1989 fishing season" means that it must make its findings based upon information for the entire 1989 fishing season (which is coextensive with the 1989 calendar year). Defendants claim that fishing vessels which leave port in December may not return for several months, and that only then can the data from such ships be collected.

Defendant misunderstands the clear meaning of the statute. The statute nowhere states that the comparison between foreign dolphin taking rates and United States dolphin taking rates must be made based upon data for the entire 1989 calendar year. The statute merely states that the comparison between the taking rates of the United States and foreign fleets must be made based upon data for "the same period." As of the end of 1989, the Secretary may not make the finding of "comparable" required to overcome the import ban unless the foreign government provides evidence that its average taking rate does not exceed 2.0 times that of United States vessels. Indeed, at the end of 1989, the Secretary could have based this finding upon data from the first six or eight months of 1989, or, at the present time, the finding could be made upon data for the entire 1989 year. The same holds for the comparability standards which pertain as of the end of 1990. The comparison can be made based upon data from the first six months of 1990, or even for the year of 1989, so long as that data demonstrates that the average taking rates of the vessels of the foreign country do not exceed 1.25 times

that of United States vessels for the same period.

If the Secretary waited for data on every yellowfin tunafish caught in 1989, then clearly the comparability finding could not have been made by the end of 1989. The result under the statute would be an intermittent ban with the beginning of each year which could only be overcome upon a showing that the statutory standards were met for the entire previous fishing season. This is clearly an unworkable policy. Instead Congress wisely established a system whereby a foreign government could avoid the import ban completely, simply by demonstrating, in a timely fashion, its compliance with the terms of the statute. This provides a great incentive for foreign governments to comply with the terms of the statute promptly and to reduce their dolphin kill rates, which was the underlying purpose of the statute.

From the legislative history, it is clear that the Congress was frustrated with what it considered to be agency foot-dragging in implementing the import ban to address the "foreign fleet problem." It is therefore understandable that Congress implemented strict guidelines establishing standards which apply as of specific dates. The system created provides incentive for both the foreign government and the agency to respectively provide the relevant information and make the requisite findings in order to continue yellowfin tuna imports.

The defendants argue that there is a long-standing agency policy that data regarding marine mammal taking rates for any given year is due from foreign governments wishing to import yellowfin tuna to the United States by July 31 of the following year. This date is now past and the relevant country reports are in. Defendants allege that now that the information is in it will take time to analyze the data and decide whether the 2.0 times limits established by the MMPA amendment was exceeded in 1989. Defendants argue that since the July 31 deadline was established policy in the federal record and was left undisturbed by Congress when it passed

the 1988 MMPA amendments, that Congress believed the policy to be adequate.

While it is true that the judiciary will generally respect agency policy, it will not do so, as in this instance, where that policy is in clear contravention of a Congressional statute. As the D.C. Circuit Court stated, review of Congressional intent is "necessary" to insure that "the agency properly construes its statutory obligations, and that the policies it adopts and implements are consistent with those duties and not a negation of them." *Adams v. Richardson*, 480 F.2d 1159, 1163–64 (D.C.Cir.1973) (en banc); *See also, Burlington Truck Lines v. United States*, 371 U.S. 156, 165–169, 83 S.Ct. 239, 244–46, 9 L.Ed.2d 207 (1962). The judiciary, in reviewing agency action, "can always ascertain whether the will of Congress has been obeyed." *Immigration and Naturalization Service v. Chada*, 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983), quoting, *Yakus v. United States*, 321 U.S. 414, 425, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1941). The defendant fails to realize that Congress did, in fact, reject the agency policy.

With the 1988 amendments, Congress explicitly stated that as of the end of 1989 the agency may not make the finding of "comparable" which is necessary to overcome the import ban unless the importing government has made a showing that its average incidental taking rate does not exceed 2.0 times that of United States vessels. Congress explicitly stated that these comparability findings must have been made by the end of 1989 in order for tuna imports to have continued. There is no way to implement the will of the legislature when the requisite data regarding 1989 was not even collected from the foreign governments until July 31 of 1990.

In fact, Congress enacted those amendment because it believed that existing agency policy was inadequate. Congress, in enacting the 1988 amendments to the MMPA, specifically rejected proposed agency guidelines which would have delayed the ban until 1991, and severely criticized the agency for delays in implementing the 1984 MMPA amendments.

As the D.C. Circuit Court stated in another case involving NMFS policy which violated the dictates of Congress expressed in the MMPA, "[p]ast administrative practice that is inconsistent with the purpose of an act of Congress cannot provide an exception and the moratorium must still be fully upheld in this situation." *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795, 802–3 (D.C.Cir.1988).

The defendants also argue that the calculations required to determine the marine mammal taking rates are very complex and time consuming, and will therefore take additional time. The defendant provides as examples calculations it makes comparing dolphin takings at different times of day and in different regions of the ocean.

Again, defendant ignores the plain language of the statute. Nowhere in the statute is the agency directed to make the above-mentioned calculations. The statute directs the Secretary of Commerce to make the simple calculation comparing the average marine mammal taking rates of foreign fishing vessels to those of United States vessels. Nowhere does the statute direct the Secretary to compare taking rates by time of day or region of the ocean. The statute requires a fairly simple calculation. In this age of computers, it is difficult to understand why this calculation would be so difficult or time-consuming. Even if additional time were required, it was incumbent upon the governments desirous of continuing imports to provide the Secretary with the requisite information so that as of the end of 1989, the Secretary could make the comparability determinations based upon the new standards. The new standards apply *now*, and no finding of comparability can be made, and hence no imports allowed, unless the Secretary finds that the importing governments have met the standards.

The Secretary appears to ignore the fact that the statute places the burden of production of documentary evidence on the foreign governments who wish to import tuna into the United States. Such governments must produce this evidence in sufficient time to allow the Secretary to make

the taking rate comparability finding. Continued imports is the incentive for production of the evidence. Under the agency's interpretation, it is the dolphins and domestic fishermen, not the foreign governments who bear the burden of the foreign governments' late production of evidence, since the Secretary allows the importation of dolphin-unsafe tuna to continue in the interim period. This clearly violates the statutory intent, which was to protect those very interests which are now bearing the burden of agency and foreign government foot-dragging.

In a similar action involving statutory import prohibitions under the MMPA, the D.C. Circuit declared invalid and inconsistent with the MMPA a decision by the NMFS to allow the importation of baby fur sealskins in the face of a statutory moratorium. *Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C.Cir.1977). In accord is *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795 (D.C.Cir.1988), in which the court struck down NMFS's decision to issue a permit to foreign fishermen which would have allowed the taking of certain marine mammals in violation of the MMPA. The Court held that the agency was without authority "by regulation or any other action, to issue a permit that allows conduct prohibited by the Act." 839 F.2d at 802. The Court rejected the agency's arguments for administrative latitude:

> Practical considerations or unavailability of information is no excuse. If the Secretary believes the Act needs an amendment, then it is Congress he must address.
>
> Id.

The Agency does not have the authority to operate under policies which violate the clear dictates of the statute. As the D.C. Circuit stated in *Public Citizen v. FTC*, 869 F.2d 1541, 1557 (D.C.Cir.1989):

> [I]n this case, Congress' rigidity is not a sign of its folly, but rather signals its intent to act swiftly and decisively ... Congress has the power to take such rigid measures. And absent an express grant of authority to change the terms of

the statute, we will not imply agency authority to alter the statutory mandate.

For the above reasons, this Court holds that the plaintiff has demonstrated a likelihood of success on the merits required to enjoin the Secretary of the Treasury from allowing the importation of yellowfin tuna caught in the eastern tropical Pacific by means of purse seines by foreign nations, unless and until the Secretary of Commerce makes a finding that the average incidental taking rate of the yellowfin tuna fishing vessels of such nation does not exceed 2.0 times that of United States vessels for the same period.

*Percentage of marine mammals taken which are of certain species*

■ Plaintiffs move this Court to issue an injunction banning the import of tuna from foreign countries unless and until the Secretary of Commerce finds that the total number of eastern spinner dolphins incidentally taken by vessels of the harvesting nation during the 1989 fishing season did not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year and the total number of coastal spotted dolphin incidentally taken by such vessels in the 1989 fishing season did not exceed 2 percent of the total number of all marine mammals incidentally taken by such vessels in that year. We deny this portion of the plaintiffs' motion because plaintiffs have demonstrated neither a probability of success on the merits nor that serious questions are raised as to the merits of this issue.

The provision upon which plaintiffs rely does not include time provisions similar to those of the incidental taking rate provision addressed above. The statutory language is the same as above, except for clause [5], and reads as follows:

> [1] The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States stan-

974

dards. For purposes of applying the preceding sentence, the Secretary—

\* \* \* \* \* \*

[2] (B) in the case of yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean, and products therefrom, to be exported to the United States, shall require that the government of the exporting nation provide documentary evidence that—

\* \* \* \* \* \*

[3] (ii) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of marine mammals by United States vessels in the course of such harvesting,

[4] except that the Secretary shall not find that the regulatory program, or the average rate of incidental taking by vessels, of a harvesting nation is comparable to that of the United States for purposes of clause ... (ii) of this paragraph unless—

\* \* \* \* \* \*

[5] (III) the total number of eastern spinner dolphin ... incidentally taken by vessels of the harvesting nation during the 1989 and subsequent fishing seasons does not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year and the total number of coastal spotted dolphin ... incidentally taken by such vessels in such seasons does not exceed 2 percent of the total number of all marine mammals incidentally taken by such vessels in such year.

16 U.S.C. § 1371(a)(2), (numbers in brackets added for reference).

Unlike the incidental taking provision discussed earlier, the above provision does not require that the new standard go into effect by the end of the 1989 fishing season, but instead, requires that the new standard be applied to data from the entire 1989 fishing season.

As with the incidental taking rate provision, the above provision directs the Secretary on to how to make the comparability findings necessary to overcome the import ban on yellowfin tuna. The provision allows the Secretary to make a finding of "comparable" only if the standards established in clause [5], above are met.

The plain language of the statute makes clear that the Secretary's finding is to be made based upon information for the entire 1989 fishing season ("during the 1989 ... fishing season"). Unlike the earlier provision, the above provision does not make the new standard applicable "by the end of the 1989 fishing season." In fact, it would make little sense if the standard were to apply as of the beginning of 1990, since the Secretary must make his findings based upon information for the entire 1989 calendar year, could not have been available until sometime *after* the beginning of 1990.

In other words, the Secretary of the Treasury still must ban foreign tuna unless the foreign government provides evidence of the comparability of its incidental takings, and the Secretary finds those takings to be "comparable" to those of the United States fleet. Such finding of comparability is not allowed unless the percentages of the above mentioned species are below the established levels for the *entire* 1989 fishing season.

Since the statute requires this finding to be based upon data for the entire previous year, it must allow the Secretary time to compile such data. The provision, unlike the above provision, does not include a specific date at which time the new comparability standard becomes effective. Given that the Secretary had for several years published in the Federal Register that annual data on marine mammal takings was due from foreign nations by July 31 of the following year, it seems likely that Congress intended for this deadline to remain in effect. Since that deadline is now passed, the defendant should make a prompt decision, based on the data submitted, as to whether the foreign nations met the above criteria in the 1989 season. If the criteria were not met for the 1989 fishing season, the Secretary may not deem the marine mammal takings to be "comparable," and tuna imports from that country must be banned.

POSSIBILITY OF IRREPARABLE INJURY

■ Since plaintiffs have demonstrated a likelihood of success on the merits based upon one of the two provisions relied upon, for purposes of a preliminary injunction, this Court must determine whether plaintiffs have also demonstrated a possibility of irreparable injury. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir.1988).

Congress clearly intended the statutory scheme it established to reduce unnecessary dolphin deaths. The Secretary of Commerce's failure to enforce the statute's clear requirements interferes with this scheme, and therefore assures the continued slaughter of dolphins. The statute was intended to use access to the United States market as an incentive for foreign nations to reduce marine mammal deaths. The Secretary, contrary to Congressional intent, has not provided that incentive.

Absent a preliminary injunction there is a possibility of irreparable injury, in that foreign nations which continue to import yellowfin tuna into the United States may continue to engage in purse seine fishing practices, including "setting on dolphins," which result in the unnecessary deaths of dolphins, in clear contravention of the intent of the statute. This is exactly the type of injury which the statute was designed to prevent. This Court held in its February 15, 1989 Order in this case, granting plaintiffs' motion for preliminary injunction requiring 100% coverage in the United States purse seine tuna boat observer program, that the risk of unnecessary dolphin deaths and injury to the dolphin population was a sufficient display of the possibility of irreparable injury to justify the granting of a preliminary injunction. Other Courts have held similarly. In *Baleo v. Baldridge*, 724 F.2d 753, 768 (9th Cir. 1984), *cert. den.*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984), Judge Nelson stated in his concurring opinion, in consideration of various provisions of the MMPA designed to prevent marine mammal deaths, "[i]f the world loses great diversity, it has truly suffered irreparable harm." Similarly, in *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795 (D.C.Cir.1988), the D.C. Circuit Court affirmed the grant of a preliminary injunction predicated on the irreparable injury which might be inflicted upon marine mammals as a result of certain violations of the MMPA.

Simply put, the continued slaughter and destruction of these innocent victims of the economics of fishing constitutes an irreparable injury to us all, and certainly to the mammals whom Congress intended to protect. Indeed, for those species now threatened with extinction, the harm may be irreparable in the most extreme sense of that overused term.

Moreover, even on the alternative standard of requiring the balancing of hardship, plaintiffs prevail. As the Supreme Court stated in *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987), "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." The D.C. District Court relied upon this language from *Amoco*, in granting a preliminary injunction under the MMPA in *Federation of Japan Salmon Fisheries v. Baldridge*, 679 F.Supp. 37, 48 (D.D.C.1987). As the Court noted, the purely economic harm suffered by foreign fishing interests as a result of the enforcement of the MMPA is outweighed by "the interests of the marine mammal populations at stake in this case. This is especially apparent when the public interest in protecting the environment is considered." Id. "[T]he public interest does not lie in protecting the economic well-being of the Federation fishermen, but, as clearly required by the MMPA, in carrying out Congress' will in protecting the marine mammals and maintaining the health and stability of the marine ecosystem." Id. at 49.

For the foregoing reasons and after careful consideration of motions, legal memoranda, exhibits, and argument of the parties, and consistent with the accompanying memorandum Opinion, IT IS HEREBY ORDERED that:

1. Defendant Secretary of the Treasury, his successors, agents, employees and assigns, are enjoined and restrained from allowing the importation into the United States of commercial yellowfin tuna or yellowfin tuna products harvested with purse seines in the Eastern Tropical Pacific by any foreign nation, unless and until the Secretary of Commerce makes a positive finding based upon documentary evidence provided by the government of the exporting nation that the average rate of the incidental taking by vessels of such foreign nation is no more than 2.0 times that of United States vessels during the same period.

2. Defendants Secretary of Commerce, Administrator of the National Oceanic and Atmospheric Administration, and Assistant Administrator of the National Marine Fisheries Service, their successors, agents, employees and assigns, are restrained and enjoined from certifying any foreign nation, or extending the certification of any foreign nation, to import commercial yellowfin tuna or yellowfin tuna products harvested with purse seines in the Eastern Tropical Pacific by any foreign nation unless and until the Secretary of Commerce makes the affirmative findings set forth in Paragraph 1 above with respect to a foreign nation seeking to import such products.

3. Defendants Secretary of Commerce, Administrator of the National Oceanic and Atmospheric Administration, and Assistant Administrator of the National Marine Fisheries Service, their successors, agents, employees and assigns, shall immediately revoke any certification for any foreign nation currently importing commercial yellowfin tuna or yellowfin tuna products harvested with purse seines in the Eastern Tropical Pacific into the United States in contravention of the substantive and procedural requirements of the Marine Mammal Protection Act set forth in paragraph 1 above.

IT IS SO ORDERED.