EARTH ISLAND INSTITUTE,
et. al. Plaintiffs,

v.

Robert A. MOSBACHER, Secretary of
Commerce, et. al. Defendants.

No. C 88 1380 TEH.

United States District Court,
N.D. California.

Feb. 3, 1992.

See also, 929 F.2d 1449.

Wondie Russell, Elisabeth A. Robinson, Geoffrey R. Kors, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs.

William T. McGivern, Jr., Paul E. Locke, U.S. Atty.'s Office, San Francisco, Cal., Charles R. Shockey, U.S. Dept. of Justice, Wildlife & Marine Resources Environmental & Natural Resources Div., Barry M. Hartman, U.S. Dept. of Justice, Environmental & Natural Resources Div., James C. Kilbourne, Dept. of Justice, Wildlife & Marine Resources Section, Washington, D.C., for defendants.

C. Hugh Friedman, Lorenz Alhadeff Ludin & Oggel, San Diego, Cal., John A. Hodges, Wiley Rein & Fielding, Washington, D.C., August J. Felando, David G. Burney, U.S. Tuna Ass'n, San Diego, Cal., for intervenors-defendants American Tunaboat Ass'n, Joseph J. Medina and Manuel A. Silva.

## ORDER

THELTON E. HENDERSON, Chief Judge.

On January 10, 1992 this Court issued its order regarding the secondary embargo provisions of the Marine Mammal Protection Act. On January 27, 1992, pursuant to Federal Defendants motion for Clarification, we issued an order amending our January 10, 1992 order. In light of a stipulation filed by the parties on January 30, 1992, we once again amend our original order as reflected herein. This Amended Order supercedes the January 10, 1992 and January 27, 1992 orders and constitutes the operative order in this case. This Amended Order does not alter the effect of the prior orders, but simply consolidates those orders.

This matter came before the Court on plaintiffs' Motion for Summary Judgment, Preliminary and Permanent Injunction. The parties argued this motion before the Court on September 23, 1991. Appearances were made by Joshua Floum for plaintiffs and Charles Shockey for defendants.

Plaintiffs brought this motion in order to enforce the secondary embargo provisions of the Marine Mammal Protection Act (MMPA). We believe that the proper interpretation of the secondary embargo is that intermediary nations must provide to the United States government, certification and proof that they have banned from importation into their countries the same commercial fish products that the MMPA bans from direct importation into the United States from harvesting nations. Failure to provide this certification and proof results in a ban of all yellowfin tuna and tuna products from those intermediary nations. For this reason, as discussed more fully below, we GRANT plaintiffs' motion for preliminary injunction, and we DENY plaintiffs' motion for summary judgment and plaintiffs' motion for permanent injunction.

## I. BACKGROUND

Tuna fishermen kill dolphins when they use purse seine fishing nets in the eastern tropical Pacific Ocean (ETP). As a result of growing public sensitivity to this incidental killing of dolphins and other marine mammals, Congress enacted the Marine Mammal Protection Act 16 U.S.C. § 1371 et seq. This case is a battle between plaintiffs—the public interest group Earth Island Institute, the Marine Mammal Fund and David R. Brower (hereinafter collectively referred to as "Earth Island") and defendants—the Secretary of Commerce,

the Administrator of the National Oceanic and Atmospheric Administration, the Assistant Administrator of the National Marine Fisheries Service (NMFS), and the Secretary of the Treasury (hereinafter collectively referred to as "the Government") over the requisites of the MMPA.

On August 28, 1990, this Court issued an order interpreting one provision of the commercial fish products ban created by the MMPA ("Aug. 28, 1990 Order"). This order enjoined the Secretary of the Treasury from allowing the importation of certain tuna products from nations which do not meet statutory measures of comparability in their incidental killing of dolphins during tuna fishing operations ("primary embargo").

Congress enacted a second provision of the commercial fish ban to respond to a perceived need to prevent "tuna laundering"—a situation in which an embargoed nation sells its tuna to an intermediary nation which, in turn, sells the otherwise banned tuna to the United States. This provision creates a secondary embargo against intermediary nations who wish to import tuna and tuna products into the United States ("secondary embargo").

Earth Island now moves for a preliminary injunction, a permanent injunction and summary judgment in their favor, to compel the Government to comply with the mandates of the MMPA's secondary embargo provisions. Earth Island alleges that the nonenforcement of the secondary embargo is causing irreparable harm because there continues to be a market for tuna caught with purse seines by nations subject to the primary embargo and, as a result, unacceptable numbers of dolphins die.

The relevant section of the Marine Mammal Protection Act, § 1371(a)(2), reads as follows:

(2) Marine mammals may be taken incidentally in the course of commercial fishing operations and permits may issue therefor under section 104 subject to regulations prescribed by the Secretary in accordance with section 103. In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching zero mortality and serious injury rate; provided that this goal shall be satisfied in the case of the incidental taking of marine mammals in the course of purse seine fishing for yellowfin tuna by a continuation of the application of the best marine mammal safety techniques and equipment that are economically and technologically practicable. The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For the purposes of applying the preceding sentence, the Secretary—

(A) [Text deleted]

(B) [Text deleted]

(C) shall require the government of any intermediary nation from which yellowfin tuna or tuna products will be exported to the United States to certify and provide reasonable proof that it has acted to prohibit the importation of such tuna and tuna products from any nation from which direct export to the United States of such tuna and tuna products is banned under this section within sixty days following the effective date of such ban on importation to the United States.

Plaintiffs and defendants agree that this section of the MMPA creates both a primary and a secondary embargo. They disagree, however, over the scope of the two embargoes.

Plaintiffs contend that the scope of the secondary embargo is broader than the scope of the primary embargo. Plaintiffs' position is that the primary embargo prohibits the importation of tuna and tuna products harvested with purse seine nets in the ETP from nations that fail to meet the comparability standards created by the MMPA ("embargoed nations"). In contrast, plaintiffs argue, the secondary embargo prohibits the importation of *all* tuna and tuna products from intermediary na-

tions, unless the Secretary obtains proof that the nation has acted to prohibit the importation of tuna and tuna products from embargoed nations.

The rationale offered for the differing scopes of the two embargoes is that Congress had different purposes in mind in enacting the statutes. According to plaintiffs, the purpose behind the enactment of the primary ban in 1972 was to change foreign fishing methods in order to protect marine mammals. The secondary embargo, on the other hand, was enacted in 1988 to bolster the effectiveness of the primary embargo by preventing circumvention of this embargo through the use of intermediary nations.

Earth Island argues that the defendants are not complying with the mandates of the MMPA. First, they contend that the Secretary of the Treasury is not obtaining the required proof from every intermediary nation, before allowing such nations to import tuna into the United States. Second, they argue that the National Marine Fisheries Service is banning only tuna caught with purse seines in the ETP under the secondary embargo, rather than all yellowfin tuna and tuna products. For these reasons, plaintiffs ask this Court to order defendants to revoke their current policies regarding the secondary embargo and to implement a comprehensive compliance program for the secondary embargo which would include the following elements: 1) systematic identification of all intermediary nations potentially subject to the secondary embargo, 2) determination, based on the proof provided by each intermediary nation, of whether that nation has prohibited the importation of all yellowfin tuna and tuna products from embargoed nations, and 3) a ban against the importation of all yellowfin tuna and tuna products from any identified intermediary nation for which such a determination cannot be made.

Defendants respond that they have complied fully with the requirements of the MMPA in implementing the secondary embargo. They argue that the scope of the secondary embargo is the same as the scope of the primary ban: both embargoes extend only to yellowfin tuna harvested with purse seine nets in the ETP. In addition, defendants claim that plaintiffs' suggested scope of the secondary embargo violates the Congressional purpose of the embargo. This purpose, defendants suggest, was "to prevent imports of tuna and tuna products taken with methods that harm[ed] dolphins excessively, not to punish nations by imposing trade sanctions without just cause." Defendants' Memorandum in Opposition to Motion Partial Summary Judgment and Preliminary and Permanent Injunction, at 16. Finally, defendants claim that their implementation of the secondary embargo has been consistent with the MMPA and the orders of this Court.

We will resolve this matter first, by analyzing the statutory language creating the secondary embargo, and then by examining the defendants' implementation of this embargo.

## II. PRELIMINARY INJUNCTION

■ Plaintiffs move for a preliminary injunction against defendants to enjoin them from allowing the importation of tuna in violation of the provisions of the MMPA. The preliminary injunction is an equitable remedy. As such, it is an extraordinary remedy, and the burden is on the moving party to make a clear showing that money damages or other remedies at law are not adequate under the circumstances. Wright & Miller, *Federal Practice and Procedure: Civil* § 2948 (1973).

■ For this Court to issue a preliminary injunction, the moving party must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and a balance of hardships tipping sharply in the plaintiff's favor. These are not two distinct tests but rather the opposite ends of a single continuum. *Miss World (UK) Ltd. v. Miss America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir.1988). A showing of irreparable harm is a prerequisite for the issuance of a preliminary injunction in any case. *Bannercraft Clothing Co. v. Rene-*

*gotiation Bd.,* 466 F.2d 345 (D.C.Cir.1972). The district court has broad discretion in deciding whether or not to issue a preliminary injunction. *K–2 Ski Co. v. Head Ski Co.,* 467 F.2d 1087 (9th Cir.1972).

## A. PROBABILITY OF SUCCESS ON THE MERITS

### (1) INTERPRETATION OF THE MMPA

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Here, as in all cases of statutory interpretation, our starting point must be the language of the statute itself. *Id.; Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988).

The secondary embargo is created by the following language of the MMPA:

The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For the purposes of applying the preceding sentence, the Secretary—

(C) shall require the government of any intermediary nation from which yellowfin tuna or tuna products will be exported to the United States to certify and provide reasonable proof that it has acted to prohibit the importation of such tuna and tuna products from any nation from which direct export to the United States of such tuna and tuna products is banned under this section within sixty days following the effective date of such ban on importation to the United States.

The motions before the Court require that we determine from this language the answers to three questions: 1) which na-

tions are subject to the certification and proof requirements of the secondary embargo; 2) which products must these nations ban in order to comply with the mandates of the statute; and finally, 3) what sanction results from an intermediary nation's failure to comply with the mandates of the statute.

Addressing the first question, application of the certification and proof requirements, we find that the language of section 1371(a)(2)(C) is clear. The requirement applies to *"any intermediary nation* from which yellowfin tuna or tuna products will be exported to the United States." (emphasis added)

■ We note that the statute does not interpret the term "intermediary nation." Where a statute is silent or ambiguous, we will defer to the interpretation of an implementing agency so long as that interpretation is reasonable. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82. The NMFS regulations define an intermediary nation as "a nation which exports yellowfin tuna or tuna products to the United States, and which imports yellowfin tuna or tuna products." 50 C.F.R. § 216.3. We accept this definition as a reasonable administrative interpretation of the term.

■ Defendants cite language from a colloquy between Senators Hollings and Breaux, for the proposition that Congress intended for defendants to have "discretion to consider [their] requirements satisfied without requiring formal government certifications when there is no reason to suspect that nations are importing tuna from embargoed nations." 134 Cong.Rec. S 17119 (Oct. 21, 1988). It is well settled that "when interpreting a statute, we need not go beyond its language unless it is ambiguous." *Green v. C.I.R.* 707 F.2d 404 (9th Cir.1983). As noted, *supra,* this statute is clear on the question of which nations are required to provide certification and proof—any intermediary nation. Thus, we reject defendants' characterization of Congressional intent, based as it is on defendants' interpretation of this Senatorial exchange.

Even if defendants' argument was correct, and we found that the statute was not clear on its face, the legislative discussion they cite would not help their case because it answers the wrong question. The discussion addresses the kind of certification and proof that will be required under particular circumstances. However, this discussion is not relevant to the question of which nations are required to provide certification and proof. On this basis, we dismiss defendants' reliance on this Senatorial exchange as unfounded.

■ The second question—which products must intermediary nations ban in order to comply with the mandates of the statute—is also answered by the plain language of the statute. Intermediary nations are required to prohibit the importation of "such tuna." This terminology, "such tuna," is also used to refer to the items which are banned from direct importation into the United States under § 1371 of the statute. It is a settled principle of judicial construction that when the same word or phrase is used in the same section of an act more than once, and its meaning is clear in one place, it will be construed to have the same meaning in the other place. *United States v. Nunez*, 573 F.2d 769 (2d Cir.1978). Applying this principle, we conclude that the MMPA requires intermediary nations to ban the importation of the same products which are banned from direct import, from the harvesting nations, to the United States. For example, yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean, which has been harvested by nations whose average rate of incidental taking of marine mammals exceeds the statutory measures contained in § 1371(a)(2)(B).

■ The final question—what sanction results from an intermediary nation's failure to comply with the mandates of the statute—is likewise answered by simple reference to the statute. Here, we apply the same analysis that we applied in our Aug. 28, 1990 Order. We begin with the operative language of § 1371 of the MMPA:

> The Secretary of the Treasury *shall ban the importation of commercial fish or products from fish* which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For the purposes of applying the preceding sentence, the Secretary—(emphasis added)

In our Aug. 28, 1990 Order, we held that this clause "establishes as the status quo a ban on importation of 'commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards.'" *Earth Island Institute v. Mosbacher*, 746 F.Supp. 964, 970 (N.D.Cal.1990). The final sentence of this clause "explains that the subsequent clauses describe how to "apply [ ] the preceding sentence [the import ban]." " *Id.*

In our Aug. 28, 1990 Order we analyzed the provisions of one of the subsequent clauses, § 1371(a)(2)(B), and concluded that this clause describes the way in which the statutory ban can be overcome by foreign nations that wish to import into the United States "yellowfin tuna caught with purse seines in the eastern tropical Pacific Ocean."[1] In the present case, the subsequent clause at issue reads as follows:

> (C) shall require the government of any intermediary nation from which yellowfin tuna or tuna products will be exported to the United States to certify and provide reasonable proof that it has acted to prohibit the importation of such tuna and tuna products from any nation from which direct export to the United States of such tuna and tuna products is banned under this section within sixty days following the effective date of such ban on importation to the United States.

---

**1.** The Aug. 28, 1990 Order interpreted 16 U.S.C. § 1371(a)(2)(B), § 1371(a)(2)(B)(ii) and § 1371(a)(2)(B)(ii)(II).

With regard to this subsection (a)(2)(C), the statute's construction is identical to the one interpreted in our Aug. 28, 1990 Order. Thus, subsection (a)(2) explains how the statutory ban can be overcome by intermediary nations who wish to import "yellowfin tuna and tuna products" into the United States.[2] The subsection specifies that in order to overcome the import ban, the intermediary nation must provide certification and reasonable proof "that it has acted to prohibit the importation" of those tuna products which are banned from direct export into the United States.

We are convinced that the subsection (a)(2)(C) creates a ban against *all* yellowfin tuna and tuna products from intermediary nations which fail to meet the subsection's certification and proof requirements. The language of subsection (a)(2)(C) imposes the certification and proof requirements on intermediary nations which seek to export "yellowfin tuna and tuna products" to the United States. We note that Congress, in subsection (a)(2)(C), chose not to modify or limit the phrase "yellowfin tuna or tuna products."

In each of the subsections of § 1371, Congress was specific in designating which commercial fish was subject to the ban. For instance, as noted in our Aug. 28, 1990 Order, subsection (a)(2)(B) of § 1371 extends the ban to "yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean, and products therefrom." Subsection (a)(2)(E) extends the ban to "fish or products containing fish harvested by a nation whose fishing vessels engage in high seas driftnet fishing." In drafting these subsections, Congress used different terms, indeed, very specific terms, each time. Applying the principle of statutory construction that clear use of different terminology is evidence of intentional differentiation, *Tafoya v. U.S. Dept. of Justice*, 748 F.2d 1389, 1392 (10th Cir.1984), we conclude that Congress intended the subsections of § 1371 to extend the commercial fish ban to specific categories of fish.

In the case of subsection (a)(2)(C), this ban extends to all yellowfin tuna and tuna products.

In summary, the secondary embargo provisions of the MMPA specify that in order to overcome the statutory ban and export yellowfin tuna and tuna products—that is, any and all yellowfin tuna and tuna products—to the United States, every intermediary nation must provide certification and reasonable proof that it has prohibited the importation of the same products which are banned from direct export to the United States. Failure to meet these requirements subjects the nation to the statutory ban which prohibits the importation of all yellowfin tuna and tuna products from that nation.

In this case, "the message conveyed by the plain language of the [MMPA] is confirmed by an examination of its history." *I.N.S. v. Cardozo Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987). The only available legislative history discussing the scope of the secondary embargo is found in the Committee reports of the House and the Senate. These reports show that both the Senate and the House understood that the secondary embargo would ban *all* yellowfin tuna from nations subject to the ban. The Report of the House Merchant Marine Fisheries Committee stated the following:

> The Committee strongly supports this provision in order to prevent embargoed nations from circumventing U.S. restrictions thus weakening the effectiveness of U.S. law. The committee expects that all yellowfin tuna and tuna products, including canned tuna containing any yellowfin tuna, whether caught in the ETP or not, will be embargoed.

House Rep. No. 100–970, 100th Cong., 2d Sess. at 30 (Sept. 23, 1988), *reprinted in* 1988 U.S.Code Cong. & Ad.News 6154; *See also*, Senate Rep. No. 100–592, 100th Cong., 2d Sess. (Oct. 7, 1988). This legisla-

---

**2.** The intermediary nation embargo provision of the MMPA refers to "yellowfin tuna and tuna products." The Court takes note that the parties to this suit agree that the term "tuna products"

means *all* tuna products containing yellowfin tuna, but not products containing *only* other species of tuna such as skipjack or albacore.

tive history reinforces our interpretation of the clear language of the statute.

■ We reject defendants' contention that the language of these reports is contradicted and superseded by the Senate discussion between Senators Hollings and Breaux.[3] Defendants believe that the scope of the secondary embargo is the same as the scope of the primary embargo, and that both embargoes only apply to tuna caught with purse seines in the ETP. Simply stated, this is not what the statute says, nor is it what Congress intended. On the basis of the plain language of the statute, supported by its legislative history, we reject defendants' interpretation of the statute.

### (2) IMPLEMENTATION OF THE MMPA

Several government officers and agencies are responsible for the implementation of the MMPA. Plaintiffs argue that these officers and agencies have not enforced the secondary embargo as required under the act. Defendants respond that they are in compliance with the act, as they interpret it. Having found that Congress has spoken directly to the precise issue of the terms and parameters of the secondary embargo, we must reject administrative constructions that are contrary to this clear congressional intent. *Chevron*, 467 U.S. at 843, n. 9, 104 S.Ct. at 2781, n. 9.

The plaintiffs designate three areas of inadequacy in the government's enforcement of the act. We will look at each in turn.

(a). Plaintiffs allege that the defendants have disregarded the plain meaning of the statute and currently allow the importation of yellowfin tuna and tuna products from intermediary nations that admittedly import tuna from embargoed nations, so long as particular shipments to the United States were not harvested with purse seines in the ETP. The defendants do not

dispute this description of their implementation, but argue that their actions meet the requirements of the secondary embargo.

■ Both plaintiffs and defendants misconstrue the plain meaning of the statute. Plaintiffs' position is wrong because the critical factor for determining whether an intermediary nation can overcome the statutory embargo is not whether that nation imports tuna from embargoed nations; but rather, whether the intermediary nation has provided certification and proof that it has prohibited the importation of that tuna which would be banned from direct export from the harvesting nation to the United States. Defendants' position is similarly flawed because when an intermediary nation fails to provide the necessary certification and proof, the statute bans the importation of all of that nation's yellowfin tuna and tuna products, regardless of where, or how, that tuna was harvested.

■ Defendants admit that they are allowing the importation of shipments of tuna which were not harvested with purse seines in the ETP from noncompliant intermediary nations. This being the case, we find that they are in violation of the plain language of the MMPA.

■ (b). Plaintiffs allege that defendants did not obtain certification and proof of compliance from all intermediary nations and yet have not subjected these nations to the secondary ban. Defendants respond that the NMFS, "(i) received evidence from the foreign government that the nation[s] did not import yellowfin tuna from the five embargoed harvesting nations trading; (ii) received a subsequent clarification that the foreign nation no longer continued to import such tuna from the embargoed nations after the embargo was in effect; or (iii) placed the nation on the list of nations subject to the intermediary embargo."

We find that, based on these allegations, defendants are not in compliance with the

---

**3.** Here again, defendants cite the exchange between Senators Hollings and Breaux, discussed *supra* at 831–832. This exchange is not relevant to the issue of the scope of the commercial fish ban against intermediary nations wishing to import yellowfin tuna and tuna products. The exchange speaks only to what kind of certification and proof will be required under particular circumstances.

mandates of the MMPA. Here again, the statute is clear: the statutory embargo is overcome when an intermediary nation provides *certification and proof* that it has *prohibited* the importation of certain tuna and tuna products. The fact that a nation does not import, or has discontinued importing, tuna subject to the primary embargo does not carry with it any guarantee that the nation will not import this tuna in the future. The terms of the MMPA do not lend themselves to such simple circumvention. For this reason, the requirements of the secondary embargo are not overcome by evidence that a nation does not import tuna from embargoed nations or by evidence that the nation has discontinued the importation of tuna from embargoed nations.

■ (c). Plaintiffs' final argument is that, in lieu of the certification and proof requirement of the Act, the defendants use a declaration of compliance obtained from the importer to ensure that a given shipment of tuna does not contain tuna harvested with purse seines in the ETP. Defendants claim that this importer certification is a supplement to the certifications and evidence that they received from foreign governments.

Whether or not an importer certifies as to the origin of a tuna shipment is irrelevant to whether an intermediary nation has provided the necessary certification and proof to overcome the secondary embargo. The MMPA requires certification and proof from the *government* of the intermediary nation, not from a private party seeking to import the tuna. Unlike the direct embargo, where only tuna harvested with purse seines in the ETP was prohibited from entering the United States, as discussed *supra,* this secondary embargo prohibits the importation of *all* yellowfin tuna and tuna products 'unless these specific conditions are met.

Therefore, unless and until defendants obtain the required certification and proof from the government of an intermediary nation, defendants are in violation of the MMPA when they allow the importation of particular shipments of tuna, regardless of whether they have obtained importer certifications for this tuna.

### (3) SUMMARY

The language of the MMPA is clear on its face. Administrative agencies, such as defendants, must give effect to the clearly expressed meaning of the statute. Defendants' interpretation and implementation of the MMPA are contrary to the meaning of the statute. On this basis, we find that plaintiffs have met their burden of demonstrating probable success on the merits of this case.

### B. IRREPARABLE HARM

■ The defendants' failure to implement the secondary embargo, as set forth in the MMPA, results in irreparable injury. The defendants' nonenforcement of the secondary embargo creates a loophole in the primary embargo and this results in the continued economic viability of harmful fishing technologies. The continued use of these technologies results in the unnecessary deaths of marine mammals. This harm to marine mammals is exactly the type of harm which the statute was designed to prevent. As we noted in our Aug. 28, 1990 Order, the risk of unnecessary dolphin deaths and injury is a sufficient display of irreparable harm to justify the granting of a preliminary injunction. *Earth Island,* 746 F.Supp. at 975.

On these bases: that the plaintiffs' have demonstrated probable success on the merits with respect to their claims that the defendants have failed to implement the mandates of the MMPA's secondary embargo, and that the result of this failure is irreparable harm, we GRANT plaintiffs' motion for preliminary injunction.

### III. PERMANENT INJUNCTION

■ A permanent injunction is appropriate where the plaintiffs prevail on the merits and demonstrate "the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Orantes–Hernandez v. Thornburgh,* 919 F.2d 549, 558 (9th Cir.1990), citing *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985). A

permanent injunction is available to combat a "persistent pattern of misconduct violative of plaintiffs' rights." *Id.* There must be " 'something more than the mere possibility which serves to keep the case alive.' " *Shanks v. City of Dallas,* 752 F.2d 1092, 1096 (5th Cir.1985); *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 848 (3rd Cir.1984).

In this case, plaintiffs have not yet prevailed on the merits. In addition, they have not proven that the misconduct will continue in the absence of permanent injunctive relief. Based on these circumstances, we DENY plaintiffs' motion for permanent injunction at this time.

## IV. SUMMARY JUDGMENT

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, to prevail in a motion for summary judgment, the moving party must establish: (1) that there is "no genuine issue of material fact, and (2) that the moving party is entitled to judgment as a matter of law." *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978); Fed.R.Civ.P. 56(c). As to matters for which the moving party will not have the burden of proof at trial, it must "point ... out to the District Court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The non-moving party must then make a showing sufficient to establish a genuine issue of fact with respect to that matter. *Id.* All reasonable inferences from the evidence are to be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The moving party must show that no reasonable trier of fact could find other than for the moving party. Schwarzer, *Summary Judgment under the Federal Rules,* 99 F.R.D. 465, 487–488 (1984). In order to deny a motion for summary judgment, however, "[t]he mere existence of a scintilla of evidence would be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party]." *Liberty Lobby,* 106 S.Ct. at 2512.

Based on the existence of genuine issues of material fact, we DENY plaintiffs' motion for summary judgment. We take notice of the diplomatic communications of the State Department regarding the secondary embargo. Whether any of these communications contain evidence of the necessary certification of prohibition from a government official of an intermediary nation is a factual question which remains contested at this point.

After careful consideration, and upon good cause showing, IT IS HEREBY ORDERED that:

1) Subject to the exception for tuna currently in transit, discussed *infra* at 836–837, defendants, the Secretary of Commerce, the Administrator of the National Oceanic and Atmospheric Administration, the Assistant Administrator of the National Marine Fisheries Service, and the Secretary of the Treasury, are enjoined from permitting the importation into the United States of all yellowfin tuna and tuna products from any intermediary nation, until they obtain certification and proof that the intermediary nation has prohibited the importation of tuna which could not be exported directly to the United States under the provisions of the primary embargo;

2) Defendants are hereby instructed to implement forthwith a program to enforce the secondary embargo in accordance with the provisions of the MMPA as set forth in this Order. This plan shall include the systematic identification of all nations which import yellowfin tuna, and which export yellowfin tuna to the United States. In addition, this plan shall require that an official of the government of *each* of these identified nations provides certification *and* proof that that nation has acted to prohibit the importation of tuna that is barred from direct importation into the United States under the terms of the MMPA, including tuna and tuna products which were harvested by embargoed nations with purse seine nets in the eastern tropical Pacific Ocean;

3) We take note of the burden that this Order may impose upon American companies who have already purchased tuna

through intermediary nations. At the same time, we take note of the fact that the secondary embargo provisions of the MMPA were enacted and placed on the books in 1988. This being the case, we are convinced that companies were on notice that the secondary embargo would ban the importation of tuna from noncompliant intermediary nations and that they should adjust their purchases accordingly. Nonetheless, in the interests of fairness, IT IS ORDERED: that this injunction shall not apply to yellowfin tuna and tuna products which are currently in transit as of the date of this order. It shall apply to all yellowfin tuna and tuna products exported after Thursday, January 30, 1992.[4]

4) In accordance with the January 30, 1992, stipulation entered by the parties, for the purposes of this injunction, the following language shall constitute an acceptable form of "certification" and "reasonable proof" as those terms are used in the MMPA, 16 U.S.C. (a)(2)(c), and NMFS regulations, 50 C.F.R. 216.24(e)(ix):

An intermediary nation may provide a written legal instrument or document as evidence that (a) it has acted to ban the import into that nation of yellowfin tuna and tuna products containing yellowfin tuna that are banned from direct export to the United States and (b) that the legal action to prohibit the import of tuna is enforceable by that nation. This legal instrument or document may consist of a legislative enactment, an executive order or decree, or administrative action by a responsible government official from the intermediary nation, provided that the action is taken in accordance with that nation's system of law. A responsible government official from the intermediary nation shall forward a copy of that written instrument or document, along with a certification attesting that the document is accurate, through appropriate diplomatic channels to the Assistant Administrator for Fisheries in the Department of Commerce, who promptly will determine whether the document and

certification constitute "reasonable proof" by the intermediary nation, as prescribed in the NMFS regulations. The Assistant Administrator promptly will publish the determination in the Federal Register and advise the United States Customs Service whether further exports from that intermediary nation shall be allowed. This language does not preclude proof of foreign law by any means authorized under Fed.R.Civ.P. 44(a)(2), (b), (c), or 44.1.

IT IS SO ORDERED.

4. The term "exported" refers to the date that the tuna physically leaves the intermediary nation and starts its trip towards the United States.