**Crosby Wilfredo ORANTES–HERNAN-DEZ, et al., Plaintiffs–Appellees,***

v.

**Richard THORNBURGH,** et al., Defendants–Appellants.**

No. 88–6192.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 1989.

Submission Vacated Dec. 11, 1989.

Resubmitted March 27, 1990.

Decided Nov. 20, 1990.

---

* Briefs of amici curiae in support of Plaintiffs–Appellees were filed by National Immigration Project, The American Immigration Lawyers Association, and Amnesty International U.S.A.

** Pursuant to Fed.R.Civ.P. 25(d)(1) United States Attorney General Richard Thornburgh is substituted for Edwin Meese as an appellant in this action.

Jay S. Bybee and Thomas M. Bondy, Appellate Staff, U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Mark D. Rosenbaum, American Civil Liberties Union Foundation of Southern Cali-

fornia, Los Angeles, Cal., for plaintiffs-appellees.

Laini Millar–Melnick and Clara A. "Zazi" Pope, Amnesty Intern. USA, Los Angeles, Cal., for Amnesty Intern. USA as amicus curiae.

Deborah Anker, Cambridge, Mass., for National Immigration Project and American Immigration Lawyers Ass'n as amicus curiae.

Before SCHROEDER and BEEZER, Circuit Judges, and VUKASIN,*** District Judge.

SCHROEDER, Circuit Judge:

## I. Introduction

This is an appeal from the entry of a permanent injunction in favor of the plaintiffs in a class action against United States government immigration officials. The plaintiff class is composed of Salvadoran nationals who are eligible to apply for political asylum, and who have been or will be taken into custody by the Immigration and Naturalization Service (INS). The district court's injunction, together with its extensive supporting findings of fact and conclusions of law, is reported in *Orantes–Hernandez v. Meese*, 685 F.Supp. 1488 (C.D. Cal.1988) (*Orantes II*).

The complaint alleged that INS officials and Border Patrol Agents prevented members of the class from exercising their statutory right to apply for asylum under the provisions of 8 U.S.C. § 1158(a) (1988). The complaint also alleged INS interference with plaintiffs' ability to obtain counsel, a right guaranteed by 8 U.S.C. § 1362 and the due process clause. *See United States v. Villa–Fabela*, 882 F.2d 434, 438 (9th Cir.1989).

The injunction appealed from requires the INS to notify Salvadoran detainees both of their right to apply for political asylum and of their right to be represented by counsel, though not at government expense. *Orantes II*, 685 F.Supp. at 1512. It enjoins the INS from coercing Salvadoran detainees into signing voluntary departure agreements and from interfering with detainees' ability to obtain counsel at their own expense. *Id.* at 1511–1513.

This injunction makes permanent a preliminary injunction imposing similar requirements. *See Orantes–Hernandez v. Smith*, 541 F.Supp. 351 (C.D.Cal.1982) (*Orantes I*). The preliminary injunction, entered in 1982, was not stayed and the government did not pursue an appeal. The preliminary injunction remained in effect for the six years preceding the entry of the permanent injunction in 1988.

Although the government has raised some legal questions on appeal, the main issue we must decide is factual in nature: whether certain findings of the district court regarding government interference with plaintiffs' rights to apply for asylum and to seek the assistance of counsel at non-government expense are clearly erroneous.

## II. Legal Background

### A. Asylum

Plaintiffs' action arises under the Refugee Act of 1980 [1] in which Congress sought to bring United States refugee law into conformity with the 1967 United Nations Protocol Relating to the Status of Refugees (UN Protocol).[2] The UN Protocol, to which the United States acceded in 1968,[3] binds parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees (1951 Convention) [4]

***Honorable John P. Vukasin, Jr., District Judge for the District of Northern California, sitting by designation.

1. Act of March 17, 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980) (codified in scattered sections of 8 U.S.C. (1982)).

2. Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267.

3. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 1, 4, *reprinted in* 1980 U.S.Code Cong. & Admin. News 141, 144.

4. Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, T.I.A.S. No. 6577, 189 U.N.T.S. 150. The United States is not a signatory to the 1951 Convention. *See INS v. Stevic*, 467 U.S. 407, 416 n. 9, 104 S.Ct. 2489, 2494 n. 9, 81 L.Ed.2d 321 (1984).

with respect to "refugees" as defined in Article 1.2 of the UN Protocol.[5] *INS v. Stevic*, 467 U.S. 407, 416, 104 S.Ct. 2489, 2494, 81 L.Ed.2d 321 (1984).

The Refugee Act was passed with the intention of codifying existing practices. It "place[d] into law what we do for refugees now by custom, and on an *ad hoc* basis. . . ." S.Rep. No. 256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 141. The Act expressly declared that its purpose was to enforce the "historic policy of the United States to respond to the urgent needs of the persons subject to persecution in their homelands," [6] and to provide "statutory meaning to our national commitment to human rights and humanitarian concerns." [7]

Prior to passage of the Refugee Act, there was no specific statutory basis for United States asylum policy with respect to aliens already in this country. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 433, 107 S.Ct. 1207, 1214, 94 L.Ed.2d 434 (1987); *Carvajal–Munoz v. INS*, 743 F.2d 562, 564 n. 3 (7th Cir.1984).[8] Congress, therefore, established for the first time a provision in federal law specifically relating to requests for asylum. *Carvajal–Munoz*, 743 F.2d at 564. Section 201(b) of the Refugee Act created section 208 of the Immigration and Naturalization Act (INA) directing the Attorney General to

> establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asy-

lum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A) of this title.

INA § 208(a), 8 U.S.C. § 1158(a) (1988); *Cardoza–Fonseca*, 480 U.S. at 427, 107 S.Ct. at 1211. Congressional intent was to create a "uniform procedure" for consideration of asylum claims which would include an opportunity for aliens to have asylum applications "considered outside a deportation and/or exclusion hearing setting." *See* S.Rep. No. 256, 96th Cong., 2d Sess. 1, 9, *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 149.

Congress added a new statutory definition of "refugee" to the INA in order to eliminate the geographical and ideological restrictions then applicable under the INA. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 1, 4, *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 144. In formulating this definition, Congress noted its intent to bring the definition of "refugee" under United States immigration law into conformity with the UN Protocol. *See id.* The definition adopted by Congress is virtually identical to the definition of "refugee" in the 1951 Convention, *see Cardoza–Fonseca*, 480 U.S. at 437, 107 S.Ct. at 1216, and is an expanded version of the UN Protocol definition of "refugee", *see Stevic*, 467 U.S. at 422, 104 S.Ct. at 2496–97.

Section 101(a)(42)(A) of the INA defines a refugee as

---

**5.** Article 1.2 of the UN Protocol defines a "refugee" as an individual who

> owing to a well-founded fear of being persecuted, for reasons of race, religion, nationality, membership in a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

**6.** Refugee Act of 1980, § 101(b), Pub.L. No. 96–212, 94 Stat. 102 (codified as Congressional Declaration of Policies and Objectives at 8 U.S.C. § 1521 note (1988)).

**7.** *See* S.Rep. No. 256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Admin. News 141, 141.

**8.** Asylum procedures for aliens already in this country and at its ports were governed by regulations promulgated in 1974 by the INS pursuant to the Attorney General's broad authority to "parole" aliens into the United States. *See Cardoza–Fonseca*, 480 U.S. at 427 n. 4, 107 S.Ct. at 1211 n. 4; *Carvajal–Munoz*, 743 F.2d at 564 n. 3. The regulations allowed aliens to apply for asylum with the INS District Director having jurisdiction over their place of residence or port of entry. *See* 8 C.F.R. § 108.1 (1977). These regulations did not, however, explicitly adopt a standard for the exercise of discretion in processing asylum applications. *Cardoza–Fonseca*, 480 U.S. at 433 n. 14, 107 S.Ct. at 1214 n. 14.

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A) (1988).

This litigation focuses on those provisions of the Refugee Act establishing the right of aliens to apply for asylum. It is undisputed that all aliens possess such a right under the Act. *See* 8 U.S.C. § 1158(a) (1988); *Jean v. Nelson*, 727 F.2d 957, 982 (11th Cir.1984) (en banc) (section 1158 confers upon all aliens the right to apply for asylum), *aff'd as modified*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1038–39 (5th Cir.1982) (same). One of the major concerns of the plaintiffs-appellees has been to ensure their ability to apply for asylum pursuant to the provisions of the Act. Much of this litigation has centered around plaintiffs' contentions that the INS was forcing them to apply for "voluntary departure" and preventing them from making an application for refugee status.[9] It is therefore necessary to have some understanding of "voluntary departure."

An alien who is in the United States illegally may be apprehended and taken into custody by INS officials. INA § 242, 8 U.S.C. § 1252(a) (1988). After an alien is apprehended, the alien is presented with a Notice and Request for Disposition Form I–274 which allows the alien to choose to depart voluntarily from the United States at the alien's own expense before deportation proceedings are instituted, or to request a deportation hearing.[10] *United States v. Doe*, 862 F.2d 776, 778 (9th Cir. 1988). Section 242(b) of the INA vests the Attorney General with discretion to award voluntary departure in lieu of initiating deportation proceedings. 8 U.S.C. § 1252(b) (1988); *Contreras–Aragon v. INS*, 852 F.2d 1088, 1094 (9th Cir.1988). This voluntary departure procedure has been called a "rough immigration equivalent of a guilty plea," allowing an alien knowingly to waive his right to a hearing in exchange for being able to depart voluntarily instead of under an order of deportation. *Id.* (citation omitted).

An advantage of voluntary departure over deportation is that it "permits the alien to select his or her own destination." *Id.* at 1090. In addition, it "facilitates the

**9.** The INA provides two procedural paths by which deportable aliens may remain in this country to avoid persecution in another country. The first path is to apply for a grant of asylum pursuant to section 208 of the Act, 8 U.S.C. § 1158 (1988). In order to qualify for asylum, an alien must meet the definition of "refugee" as defined in the INA. *Stevic*, 467 U.S. at 423 n. 18, 104 S.Ct. 2497 n. 18. The alien must show a "well-founded fear" of persecution based on one of the five statutorily impermissible bases. *See* INA § 208(a), 8 U.S.C. § 1158(a) (1988); INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (1988). Even if an alien satisfies the definition of a refugee, he is not automatically granted asylum; the decision to grant a particular application rests in the discretion of the Attorney General granted under INA § 208(a). *Id.* § 1158(a).

The second path by which deportable aliens presently within the United States may remain here to avoid persecution is to apply for withholding of deportation. *See* INA § 243(h), 8 U.S.C. § 1253(h) (1988). To qualify for withholding, an alien must show a "clear probability" of persecution as opposed to the "well-founded fear" required for asylum. INA § 243(h), 8 U.S.C. § 1253(h) (1988). *See Cardoza–Fonseca*, 480 U.S. at 423, 107 S.Ct. at 1208–09, *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1281–82 (9th Cir.1984). Unlike the discretionary standard governing requests for asylum, however, if an alien qualifies for withholding, the Attorney General is prohibited from deporting the alien. *See Stevic*, 467 U.S. at 421 n. 15, 104 S.Ct. at 2496 n. 15; *Bolanos–Hernandez*, 767 F.2d at 1281–82. Asylum and withholding of deportation decisions made by immigration judges and reviewed by the Board of Immigration Appeals are subject to direct review by courts of appeal. *See* INA §§ 106(a), 242(b), 8 U.S.C. §§ 1105a(a), 1252(b) (1988).

**10.** Prior to 1983, all aliens, other than Mexicans, were presented with a Request for Voluntary Departure Form I–274A. That form contained only one option for which the alien could sign, that of voluntary departure. *See infra* Part V(B).

possibility of return to the United States" because an alien who leaves under a grant of voluntary departure, unlike a deported alien, does not need special permission to reenter the United States and does not face criminal penalties for failure to obtain that permission. *Id.; see also* INA §§ 212(a)(17) and 276, 8 U.S.C. §§ 1182(a)(17) and 1326 (1988).

There are disadvantages to voluntary departure as well. Aliens who voluntarily depart this country lose the right to apply for asylum before deportation proceedings are initiated. They also give up their right to a deportation hearing at which they may also apply for and have their asylum claim considered before an Immigration Judge. Not only do aliens who accept voluntary departure lose these rights, they may leave the United States without even knowing of these rights and options.

An application for voluntary departure under section 242(b) of the INA must be made prior to the commencement of a deportation hearing and no appeal lies from the denial of the application. *Contreras–Aragon*, 852 F.2d at 1094. If an alien chooses not to depart voluntarily, a proceeding to determine the deportability of the alien is commenced by an immigration official who issues and files an order to show cause with the Office of the Immigration Judge.[11] 8 C.F.R. § 242.1(a) (1990). INS regulations give exclusive jurisdiction to the Immigration Judge to consider asylum applications once an alien is in custody, the characteristic that defines the plaintiff class in this case. *See generally* 2 Gordon & Gordon, *Immigration Law and Procedure* § 18.04[1](a) (rev. ed. 1990).

### B. Counsel

The INA also provides aliens with the right to be represented by counsel in deportation proceedings at no expense to the government. *See* INA § 292, 8 U.S.C. § 1362 (1988). The Act specifically requires the Attorney General to adopt regulations to assure the right of counsel of one's choice. *See* INA § 242(b)(2), 8 U.S.C. § 1252(b)(2) (1988). The INS has done so in a regulation requiring that upon personal service of an order to show cause why an alien should not be deported, the alien "shall ... be advised of his right to representation by counsel of his own choice at no expense to the Government." 8 C.F.R. § 242.1(c) (1990). The regulations go on to describe persons and groups entitled to represent aliens in deportation proceedings, and make it possible for persons who are not attorneys to represent aliens in such proceedings. *See id.* § 292.1.

This court has held that aliens have a due process right to obtain counsel of their choice at their own expense. *Rios–Berrios v. INS*, 776 F.2d 859, 862 (9th Cir.1985). We have "consistently emphasized the critical role of counsel in deportation proceedings. We have characterized an alien's right to counsel as 'fundamental' and have warned the INS not to treat it casually.... [T]hat right must be respected in substance as well as in name." *Baires v. INS*, 856 F.2d 89, 91 n. 2 (9th Cir.1988) (citations omitted). Other circuits agree that counsel may play a critical role in deportation proceedings. *See Lozada v. INS*, 857 F.2d 10, 13 (1st Cir.1988); *United States v. Saucedo–Velasquez*, 843 F.2d 832, 834–35 n. 2 (5th Cir.1988); *Cobourne v. INS*, 779 F.2d 1564, 1566 (11th Cir.1986); *Casteneda–Delgado v. INS*, 525 F.2d 1295, 1300 (7th Cir. 1975).

### III. The History of This Litigation

#### A. The Preliminary Injunction

This action was filed on March 4, 1982. The complaint alleged that INS officials were routinely coercing Salvadorans to "voluntarily depart" the United States in lieu of exercising their rights to a deportation hearing and to seek political asylum. According to plaintiffs' complaint the INS was failing to advise Salvadorans of their right to seek political asylum within the United States and was interfering with, or preventing, Salvadorans from exercising

---

11. The Attorney General is also vested with discretion to award voluntary departure to aliens who are engaged in deportation proceedings.

*See* INA § 244(e), 8 U.S.C. § 1254(e) (1988); 8 C.F.R. §§ 242.17(b), 244.1, 244.2. (1990).

their right to assistance of counsel. The class members also claimed that the INS was failing to provide adequate telephone access to detained Salvadorans and prohibiting them from receiving or possessing any written material other than the New Testament. Finally, they alleged that the INS did not provide and maintain adequate law libraries at detention facilities and placed Salvadoran detainees in solitary confinement without notice and a hearing.

Prior to entry of the preliminary injunction, the district court held two hearings. The court granted provisional class certification and issued a preliminary injunction on April 30, 1982. The preliminary injunction prohibited the INS from coercing class members in any way when informing them of the availability of voluntary departure. The district court also ordered the INS to provide Salvadorans with two forms of notice of their rights before informing them of the availability of voluntary departure. The first form of notice was required to be given orally in both English and Spanish and advised the Salvadoran that he or she was: a) being detained by the INS; b) to be handed a written notice of rights which must be read carefully before deciding whether to be voluntarily returned to El Salvador, to demand a deportation hearing, or to request political asylum; and c) required to sign the notice to show that it was received. The second form of notice, printed in both English and Spanish, advised the class member that he or she had the right to: a) be represented by an attorney; b) a deportation hearing; c) apply for political asylum; and d) request voluntary departure. Under the terms of the injunction the class member was also to be given a list of free legal services along with the notices, and was to be allowed to retain copies of all of these documents.

The INS was also ordered to provide information on detained Salvadorans to interested relatives and counsel, and to provide an attorney who had filed written notice of appearance 24 hours advance notice before removal of a class member from the United States. The INS had to allow counsel to rescind voluntary departure agreements, and permit paralegals access to detainees. Two major INS detention centers where many class members were detained are located in El Centro and Chula Vista, California. The court ordered the INS to allow detainees at El Centro and Chula Vista to receive and possess legal materials and to install, or make available, telephones in the Chula Vista facility. The INS was also ordered to allow counsel reasonable access to detainees at El Centro. Finally, the INS was enjoined from placing any class member in solitary confinement for more than 24 hours, except upon good cause shown and unless the class member had written notice and a hearing.

On June 2, 1982, the district court entered an extensive opinion explaining the basis for its injunction and the nature of the testimony upon which it was based. *See Orantes I,* 541 F.Supp. 351. The relief ordered was identical to that in the order of April 30, 1982. *See id.* at 385–88. The government did not pursue an appeal of the preliminary injunction.

### B. The Permanent Injunction

The preliminary injunction remained in effect while the district court heard testimony and received deposition and other evidence from approximately 175 witnesses. These witnesses included members of the plaintiff class, government agents and immigration attorneys representing aliens. At the conclusion of the trial, the district court entered its permanent injunction stating that "INS practices and procedures have not adapted sufficiently in response to the preliminary injunction to preclude the necessity for permanent injunctive relief." *Orantes II,* 685 F.Supp. at 1495, finding 47. The court also reiterated the essence of the findings that had been the basis for the preliminary injunction and of INS practices that had continued despite the injunction. *See id.* at 1490–1503, findings 1–118.

The district court reviewed the government's compliance with the preliminary injunction, including its requirement that agents provide arrested Salvadorans with a written advisal of rights (the *"Orantes* advisal"). *See id.* at 1505–06. The court found that despite the existence of the pre-

liminary injunction, the INS continued to engage in a pattern and practice of coercion and that the members of the plaintiff class continued to be prevented from exercising their rights both to apply for asylum and to obtain counsel. *See id.* The court's conclusion stated in part:

> The record before this Court establishes that INS engages in a pattern and practice of pressuring or intimidating Salvadorans who remain detained after the issuance of an OSC to request voluntary departure or voluntary deportation to El Salvador. There is substantial evidence of INS detention officers urging, cajoling, and using friendly persuasion to pressure Salvadorans to recant their requests for a hearing and to return voluntarily to El Salvador.

*Id.* at 1505, conclusion 16.

The court also concluded:

> The need for permanent injunctive relief is clearly established by defendants' persistence in engaging in conduct violating both the letter and spirit of the preliminary injunction and their failure to take corrective measures absent the compulsion of a court order.

*Id.,* conclusion 18.

In addition, the district court found that the government's partial compliance had not created any burden, and that full compliance would not result in any significant additional hardship. The court pointed out that "[a]fter nearly five years of operating under the preliminary injunction, the government was not able to present any evidence of such burden." *Id.* at 1508, conclusion 38.

The district court's extensive opinion with its findings of fact and conclusions of law supporting permanent injunctive relief was filed with the order imposing the permanent injunction on April 29, 1988, and this appeal followed.

## IV. Legal Analysis

The district court's injunction is designed to ensure the ability of the plaintiff class members to exercise their rights to apply for political asylum and to seek the assistance of counsel. The existence of those rights is not seriously in issue. Hence, what is disputed is not rights but remedies.

With respect to asylum, the key remedy contained in the district court's injunction is the *"Orantes* advisal," the provision requiring the government to give members of the plaintiff class actual written notice of their right to apply for asylum. This remedy rests upon three alternative and independent legal bases. One is that notice is required as a matter of due process. *See Orantes II,* 685 F.Supp. at 1506–07, conclusions 24–25. The second is that notice is required in order to fully effectuate the intent of the Refugee Act. *See id.* at 1506, conclusions 19–23. The third is that such notice is required in this case as a remedial measure to counteract the pattern of interference by the INS with the plaintiff class members' ability to exercise their rights. *See id.* at 1507–08, conclusions 26–43.

The government's threshold attack on the injunction is focused on the first two bases for the injunction, namely that as a matter of law the INS is required to give notice of the right to apply for asylum to all aliens it processes. This court has not considered this issue, but other courts have. *See Jean,* 727 F.2d 957; *Ramirez–Osorio v. INS,* 745 F.2d 937 (5th Cir.1984). The decisions in those cases stop short of holding that aliens have a statutory or constitutional right to blanket notice of the right to apply for asylum. The decisions agree, however, that notice should be given to those aliens who indicate that they fear persecution if they were to be returned home. *See Jean,* 727 F.2d at 983 n. 35; *Ramirez–Osorio,* 745 F.2d at 943–44.

The issue of notice was discussed at some length in *Jean.* The Eleventh Circuit held that there is no notice requirement in the statute itself and further, that aliens have no due process right to notice of the right to apply for asylum. *See* 727 F.2d at 981–83. The court recognized, however, that the Act would be violated if aliens who indicated they feared persecution if returned home were not advised of the right to seek asylum. *See id.* at 983 n. 35. The court said that "if INS officials were refusing to inform aliens of their right to

seek asylum even if they did indicate that they feared persecution if returned to their home countries ... [t]his would constitute a clear violation of the Refugee Act, and remedial action would be justified...."
*Id.*

The Eleventh Circuit in *Jean* concluded, however, that no remedial action was necessary in that case. It reached this conclusion based on the testimony of the Acting Commissioner of the INS who represented during congressional hearings that it is INS policy for agents to provide notification of the right to apply for asylum to those aliens who indicate they have a fear of persecution if returned home. *See id.* (citing Caribbean Migration: Oversight Hearings Before the Subcomm. on Immigration, Refugees and International Law of the House Comm. on the Judiciary, 96th Cong., 2d Sess. 225 (1980) (statement of David Crosland, Acting Commissioner, INS) (hereinafter "Oversight Hearings")). Other courts have relied upon this testimony as an accurate description of INS policy when those courts declined to impose a remedial notice requirement. *See Duran v. INS,* 756 F.2d 1338, 1341 & n. 3 (9th Cir.1985); *Ramirez–Osorio,* 745 F.2d at 941 n. 6, 943–44 (court refused to require INS to provide aliens with blanket notice of the right to apply for asylum but found it "significant" that INS gives notice to aliens who express a fear of persecution).[12] *Cf. Haitian Refugee Center,* 676 F.2d at 1041 n. 48 (agency deviation from its own regulations and policies may justify judicial relief).

In this case, the government has not gone so far as to acknowledge that aliens who have a good faith fear of persecution should be advised of their right to apply for asylum. Such acknowledgment would, in the context of this case, amount to a concession that the *Orantes* advisal is required as a matter of law to many members of the

plaintiff class. The government has, however, appropriately conceded in oral argument that if the evidence in this case supports the district court's findings of a pattern of coercion and interference with the plaintiff class members' right to apply for asylum, then the INS would be violating the Act and remedial action would be justified.

Accordingly, it is not necessary for us to reach any constitutional or even statutory interpretation issues with regard to the notice requirement if the record in this case supports the district court's findings with regard to the INS's conduct and reflects the appropriateness of the injunctive relief ordered. Such an approach is consistent with the general principle that we should not reach constitutional issues if the case can be decided on another basis. A fundamental rule of judicial restraint requires courts to consider nonconstitutional grounds for decisions before reaching any constitutional questions. *Jean,* 472 U.S. at 854, 105 S.Ct. at 2996–97; *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981).[13] We therefore direct our focus to the district court's alternative grounds for ordering the INS to advise the plaintiff class members of the possibility of applying for refugee status.

■ Before turning to the district court's findings, we review the legal standards under which we weigh the appropriateness of injunctive relief against an agency of the federal government. We agree with the government that to obtain injunctive relief against government actions which allegedly violate the law, "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983) (citations omitted). Thus, a "showing at trial of relatively few instanc-

**12.** In July, 1990, the INS promulgated new regulations codifying this policy. *See* 8 C.F.R. §§ 208.5(a), 242.17(c)(2), & 236.3(a) (1990).

**13.** The district court made extensive findings of fact regarding the political conditions in El Salvador. *See Orantes II,* 685 F.Supp. at 1491–93, findings 8–26. The district court evaluated this

evidence in determining that the class members had a due process right to notice of the right to apply for asylum. *See id.* at 1503, conclusion 5. We are not reaching the constitutional question in this appeal, and therefore, we need not address the government's argument that conditions in El Salvador are irrelevant.

es of violations by [defendants], without any showing of a deliberate policy on behalf of the named defendants, [does] not provide a basis for equitable relief." *Id.* at 104, 103 S.Ct. at 1666 (discussing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). Injunctive relief, however, is available to combat a persistent pattern of misconduct violative of plaintiff's rights. *See Allee v. Medrano,* 416 U.S. 802, 815, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1974); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *LaDuke v. Nelson,* 762 F.2d 1318, 1324 (9th Cir.1985), *modified on other grounds,* 796 F.2d 309 (9th Cir.1986). *See also Rizzo,* 423 U.S. at 375, 96 S.Ct. at 606 (distinguishing *Allee* and *Hague* as involving patterns of misbehavior, not isolated incidents).

■ Plaintiffs must demonstrate " 'the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law.' " *LaDuke,* 762 F.2d at 1330 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 679, 38 L.Ed.2d 647 (1974)). To satisfy this standard, plaintiffs must establish actual success on the merits, and that the balance of equities favors injunctive relief. *Id.* That is, the plaintiff seeking an injunction must prove the plaintiff's own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which the plaintiff bases the right to and necessity for injunctive relief. *Citizens Concerned for Separation of Church & State v. Denver,* 628 F.2d 1289, 1299 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981).

■ Once plaintiffs establish they are entitled to injunctive relief, the district court has broad discretion in fashioning a remedy. *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow"); *Coca–Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1256 n. 16 (9th Cir.1982). *See also Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462,

95 L.Ed.2d 871 (1987) (scope of injunctive relief is reviewed for an abuse of discretion). There are limitations on this discretion; an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled. *See Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).

In other cases involving INS actions, this court has upheld injunctive relief based on findings that the INS engaged in a persistent pattern of misconduct violating aliens' rights. *See International Molders' and Allied Workers' Local U. v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986) (findings of "extensive evidence of INS agents exceeding official policy" could hardly be characterized as isolated incidents); *Nicacio v. INS,* 797 F.2d 700, 702 (9th Cir.1985) (INS officers' conduct "recurrent and in violation of plaintiffs' constitutional rights"); *LaDuke,* 762 F.2d at 1324 (INS officers "engaged in a standard pattern" of misconduct); *Zepeda v. INS,* 753 F.2d 719, 726 (9th Cir.1983) (pattern of INS violations of the fourth amendment).

The decisions of this court involving injunctions against the INS have focused additionally upon the important role of the federal courts in constraining misconduct by federal agents. We have observed that the "prudential limitations circumscribing federal court intervention in state law enforcement matters" involved in *Lyons* and *Rizzo* were inapplicable. *See LaDuke,* 762 F.2d at 1324; *Nicacio,* 797 F.2d at 702; *International Molders',* 799 F.2d at 551–52.

In this case, the equities favor issuance of the injunction if the findings of the district court with respect to INS practices are supported by the evidence. The government has not pointed to any evidence in the record to show that the issuance of the preliminary injunction caused any additional burden to it or that compliance with the permanent injunction would result in any appreciable burden. The government has asserted that informing all aliens of the right to apply for asylum is "potentially" burdensome because it will foster frivolous claims. However, the

government does not provide support for this supposition.

Our decision in this case therefore must focus on whether the court's factual findings concerning the conduct of INS agents are clearly erroneous. We thus must turn to the nature of the district court's findings and a more comprehensive description of the evidence in the case.

## V. The District Court's Findings and Evidence Concerning INS Interference With the Right to Apply for Asylum

The injunction on appeal to this court made permanent a preliminary injunction based mainly upon the district court's findings of a pattern and practice of interference and coercion on the part of INS agents which prevented Salvadoran aliens who feared return to their country from exercising their right to apply for asylum. One of the government's major contentions on appeal is that the entry of the permanent injunction was unwarranted because there were significant changes in circumstances after the entry of the preliminary injunction which made a permanent injunction unnecessary. In order to analyze this contention, it is necessary to have some familiarity with the voluminous record in this case concerning conditions as they existed both before and after the preliminary injunction.[14]

### A. The Record Supporting the Preliminary Injunction

The district court found that prior to the issuance of the preliminary injunction, INS agents coerced Salvadorans who had not expressed a desire to return to El Salvador to sign Form I–274A for voluntary departure. *See Orantes II,* 685 F.Supp. at 1494, finding 33. The evidence supporting this finding is overwhelming.

Form I–274A contained only one signature line and once signed, the alien waived the rights to counsel and a deportation hearing and was processed for voluntary departure. The form did not discuss the

alien's right to apply for asylum. However, by signing for voluntary departure, aliens also effectively waived their right to apply for asylum. Numerous class members testified of being forced or tricked into signing for voluntary departure. For example, Freddy Antonio Cartagena signed the voluntary departure form without being given a chance to read it and was just told to "sign here." Marta Ester Paniagua Vides was given a form. She asked the agents if the form was for voluntary departure and they assured her it was not. She signed the paper and it in fact turned out to be Form I–274A. Another witness, Martha Osorio Sandoval, testified she told the agents that she did not want to sign for voluntary departure after reading the form. The agents told her that she had to sign and if she did not, she would remain detained in jail for a long time. Juan Francisco Perez–Cruz, arrested in 1980, did not request asylum even though informed of it because the agent told him that asylum was only for people who were fleeing their country because they were an enemy of the government or an assassin. The agent also told Perez–Cruz that if he wanted asylum, it would be 3 to 6 months, he would be detained the entire time and that if he did not get asylum he would be deported. He was given Form I–274A and told to "sign where the mark is."

Other class members testified about being told that they must apply for voluntary departure even though they expressed fears about returning to El Salvador. Noe Castillo Nunez, apprehended in September 1981, told INS agents that he was afraid to go back to El Salvador because he had received death threats. The agents told Nunez the threats were his problem, that they did not care what happened to him, and that he should return because he would be deported anyway. Nunez was then given some forms and told to "sign here." The papers were quickly taken away and Nunez did not know what he signed. He told the agents that he wanted

14. This opinion cannot describe the entire record before the district court. Rather, the testimony recounted here is representative of the approximately 15,000 pages of testimony in evidence below.

to apply for asylum, but they told him they did not know anything about it. Dora Alicia Ayala de Castillo was apprehended in September 1981 with 23 members of her family. She told the agents that she and her family were fleeing from the war and begged the agents to help them. She also told the agents that if they went back to their country they were in danger of dying. de Castillo signed for voluntary departure without ever being told about the right to apply for asylum.

Jorge Antonio Joya, apprehended on April 16, 1981, was given a voluntary departure form and told to "sign it." Joya could not read the form because it was in English, but the agent told him it was for his deportation to El Salvador. Joya begged the agent and told him that he could not go back. The agent laughed at Joya and told him to "just sign." Joya further testified that while he was detained in El Centro, an officer often told Salvadorans who had applied for asylum that their applications would never be granted and the best thing they could do would be to sign for voluntary departure.

Even those who asked expressly about political asylum were forced to sign the voluntary departure form. Gloria Esperanza Benitez de Flores was apprehended in March, 1982. The day after her apprehension, INS agents requested more than five times that she sign for voluntary departure. The agents placed her in a jail cell and told her she would remain there for a long time if she did not sign. When Benitez de Flores asked the agents about asylum, she was told that the INS was not giving anyone asylum, that it would be useless for her to stay, and it would be better for her to sign for voluntary departure. Dora Elia Estrada, arrested in 1980, refused to sign a voluntary departure form and asked for asylum. The agent who arrested her told her that political asylum "wasn't given" in the United States, and that if she did not sign for voluntary departure she was going to be in detention for a long time in a jail where there were "only men." Another guard told Estrada that if she asked for asylum, the money she posted for bail would be lost and she would be

returned to El Salvador; another agent told her that the information she gave them would be sent to El Salvador.

Many class members recounted similar stories of their experiences during the period before the preliminary injunction was entered. They included Jose Sanchez Flores, Hector Abel Giron Funes, Manuel de Jesus Umana Fiallos, Jose Francisco Marroquin Salvador, Louis Renato Canjura, Crosby Wilfredo Orantes–Hernandez, Esperanza Alvarado Orteaga, Benigno Linares Gonzalez, Maria Bonilla Amaya, Camilo Daniel Medrano Melendez, Ines Margarita Montano–Amaya, Julio Cesar Martinez Flores, Ana Estela Guevara Flores, and Delia Elizabeth Garcia–Quintanilla.

It is significant that the government offered no contradictory evidence to suggest these events did not occur. It is at least equally significant that the testimony of INS agents themselves confirmed it was their accepted practice not to inform Salvadorans about asylum and to proffer only voluntary departure, even when the Salvadorans expressed fear of return. This practice was directly contrary to the stated policy of the head of the INS, who had represented that INS agents provide notice of the right to apply for asylum to aliens who indicate they fear persecution in their homeland. *See* Oversight Hearings, 96th Cong., 2d Sess. 225 (1980).

Examples of the agents' testimony in this case are as follows. Border Patrol Agent Michael Singh testified that prior to the *Orantes* injunction, he was instructed to continue processing an alien if, during processing, the alien says that he is afraid to return to his country. Singh would fill out an asylum application only if the alien used the words "I want political asylum." If the alien did not use those words, the general policy was to continue processing for deportation. Even if the alien said that he feared persecution on return to his country, processing continued and no asylum form would be proffered. Singh was aware of no policy that the INS had to inform Salvadorans of their right to asylum if they feared persecution. He testified

that prior to the injunction it was not his practice or the practice of other agents to inform Salvadorans of their right to apply for asylum even when the Salvadorans expressed fear of persecution.

David Pfeifer, the Deputy Chief of Border Patrol since 1980, testified that prior to the injunction, agents were not required to explain anything to the alien other than what was stated in Form I–274A for voluntary departure. Jim Carter, a criminal investigator with the INS since 1977, testified that prior to the preliminary injunction in this case, he did not advise Salvadorans that they had a right to apply for asylum even if the alien said he was afraid to return to his country. Border Patrol Agent Ronald Knight testified that prior to the *Orantes* injunction, agents were not instructed to ask detainees whether they feared persecution if returned to their homeland.

Senior Border Patrol Agent John D. Edwards, an agent for 9 years, testified about a pre-injunction arrest of a number of Salvadoran women. He testified that he did not tell any of the women that they could apply for asylum if they feared returning to El Salvador. Discussing the same incident, Special Agent Johnny Mendez testified he did not tell one of the Salvadoran women that if she feared return to El Salvador she could apply for asylum because "[i]t wasn't within [his] authority or [his] job description to advise her." Agent Tracy L. Kirk testified that before the *Orantes* injunction, he processed hundreds of Salvadorans and never advised any of them of the right to apply for asylum, even if the aliens told Kirk they feared return to El Salvador.

In sum, the testimony of both members of the plaintiff class and INS agents demonstrated a pattern of INS interference with the class members' right to apply for asylum. The district court's order requiring the INS to provide the *"Orantes* advisal" to class members was to remedy this interference. Because the key issue in this appeal concerns whether the record supports the district court's decision to make that injunction permanent, we turn to the record with respect to the post-preliminary injunction period.

### B. Post-preliminary Injunction Interference With the Right to Apply for Asylum

■ In entering the permanent injunction, the district court found that although the *"Orantes* advisal" had served to protect the rights of some class members, the INS did not in fact provide the advisal to many other class members. *See Orantes II,* 685 F.Supp. at 1498–99, findings 76 & 78. The court found that without continuing the advisal in effect, there was a substantial likelihood that class members would be deprived of their right to apply for asylum. *Id.* at 1499, finding 79. The court concluded that both before and after the issuance of the injunction, the INS had engaged in a pattern and practice of conduct encouraging voluntary departure and discouraging asylum. *Id.* at 1507, conclusion 28.

The government contends that these findings are unsupported by evidence in the record as to events which occurred after 1983 when its forms were changed in response to the preliminary injunction. The government asks us to judge its conduct from February, 1983, when it revised its voluntary departure form, replacing the old I–274A with a new Form I–274. The old form was inadequate, as the government recognizes, because the only signature line on it was for voluntary departure. When Salvadorans were given the form and asked to sign, their perception was that they had no choice other than to accept voluntary departure.

The new Form I–274 contains two signature lines permitting the alien to opt for voluntary departure or to request a deportation hearing. Yet the form itself does not say anything about the right to apply for asylum. The words "asylum" or "refugee" do not appear on it. Aliens receiving that form would reasonably perceive their options to be limited to either voluntary departure or deportation. Thus the form alone does not address the problem to which the *Orantes* advisal was directed.

Moreover, nothing in the form either prevented or held up to question anything INS agents might do or say to encourage voluntary departure and intimidate aliens from further inquiry and exercise of their asylum rights.

█ Indeed, the evidence in the record shows that despite the change in forms, the pattern of inducing class members into accepting voluntary departure persisted, even where the alien expressed fear of returning to El Salvador or had specifically requested asylum. For example, there was testimony that on many occasions agents circled the signature line for voluntary departure or put an "X" on the form next to it, telling the alien to "sign here." There was also evidence that agents gave forms in English to class members who could not understand that language.

Quiro Jaime Navarro, apprehended in August, 1984, told INS agents that his life was in danger in El Salvador. The agents told him that if he did not have money for bail, he did not have a case. Navarro was given Form I–274 and he testified he knew where to sign for voluntary departure because the agents made an "X" on the form. He signed for voluntary departure without ever being told of the right to apply for asylum. After Raul Sosa Rodriquez was arrested in 1985, he was shown the *Orantes* advisal and requested asylum. Nevertheless, an INS agent then gave Rodriquez Form I–274 and marked an "X" next to the place to request voluntary departure. Rodriguez signed the form even though he did not understand its relevance. Carmen Dinora Orellana testified that after her apprehension in November, 1983, INS agents pointed to the signature lines on Form I–274 and the *Orantes* advisal and told her "you have to sign here."

Maria Santos Madril, who did not know how to read or write, was given Form I–274 after being detained for several days. The agent took her hand and said "sign here." When Madril responded that she could not sign for her deportation, the INS agent grabbed her hand and physically forced her to make an X as her signature on Form I–274. Luis Enriguez Gomez–

Buergos, Jose Israel Gomez–Murillo, and Carlos Rudolfo Linares–Landaverde also testified that agents marked an "X" on forms indicating where they should sign for voluntary departure.

Similarly, after Juan Antonio Mendoza–Chavez requested a deportation hearing, and despite his telling INS agents that he left El Salvador due to problems he had with the guerillas, the agents continued to ask if he wanted to voluntarily depart. He was given papers written in English even though he told the agents he only understood Spanish. The agents told him he had to sign at the "X". Fernando Escamilla, Mauricio A. Colocho Recinos, Jose Salomon Morales, and Jose Israel Gomez–Murillo, none of whom understood English, also testified that they were only given forms in English.

The district court found that after the preliminary injunction was in effect, INS agents continued to tell Salvadorans that if they applied for asylum it would be denied, or that they would be deported regardless of their asylum application. *See Orantes II*, 685 F.Supp. at 1495, finding 40. The court found that INS agents were misrepresenting eligibility for asylum, telling class members that information on the application would be sent to El Salvador, and threatening to transfer class members to remote locations if they exercised their right to request a hearing or to apply for asylum. *See id.*, findings 40–42. The court also found that INS agents threatened the aliens by telling them that they would be detained a long time if they asked for asylum. *Id.* at 1494–95, finding 39. There is post–1983 evidence of INS agents making such representations in conjunction with the *Orantes* advisal and in contravention of its purpose. Some examples follow.

After Jose Hernan Sanchez–Velasquez was read the contents of the *Orantes* advisal, he asked what "asylum" was. An INS agent told him that he could only ask for asylum if he was a guard or a guerilla, and that he would be detained for ten years. Heber Reynaldo Santos was given the *Orantes* advisal and asked an INS agent for more information about the "situation for

political refugees." The agent told him there were a lot of Salvadorans in jail waiting for asylum and that they had spent four to seven months there. The agent told Santos that those aliens would remain in jail and eventually be deported anyway because it was difficult to obtain asylum. Santos later received legal help and was granted asylum and withholding of deportation. Jaime Rodriguez Alas told an INS agent that he was being persecuted in his country and could not go back. The agent told him that he could apply for asylum but it would take a long time and Alas would have to remain detained for possibly a year or more. Miguel Enrique Avila–Ochoa, arrested in 1985, testified that INS officers commented that aliens who asked for asylum would "remain in El Centro maybe for six months or a year and it would come to no good anyway."

In addition, although INS agents were required to give aliens the *"Orantes* advisal" along with Form I–274, the record shows that some agents did not even show aliens the advisal. This was testified to by Jose Salomon Morales, Quiro Jaime Navarro, Juan Alfonso Peralta Escoto, Maria Santos Madril, Jaime Rodriguez Alas, and Ana Marina Flores. Their testimony is uncontradicted.

The district court also faulted the INS for its lack of corrective measures following the entry of the preliminary injunction, pointing out the lack of training, lack of discipline, and lack of uniform policies and procedures for processing aliens. *See Orantes II*, 685 F.Supp. at 1495–96, 1499–1500, findings 46–47, 49–50, 82–86. These findings also have full support in the record.

Harry F. Malone has been the supervisory detention and deportation officer at El Centro since March of 1981. His duties include ensuring that procedures at El Centro comport with INS regulations and policies. Malone testified that his supervisor, the district director, had never engaged in any formal review of the practices and procedures of El Centro to ensure that they comport with national policies and practices governing the operation of the center.

Jeffrey Parsons, a Border Patrol Agent in Calexico, testified that he did not recall attending classes where political asylum procedures and laws were discussed and that since attending the academy, he had not received any training or instruction on asylum procedures. Parsons testified that he was not sure of all the criteria needed to qualify as a refugee, but he knew where to look it up in the "law books." Charles Warden, a Border Patrol Agent for 17½ years, testified that he had never seen an asylum application. Warden did not recall getting instructions regarding providing aliens with asylum applications and received instructions regarding advising aliens of asylum only due to the *Orantes* injunction.

Ruben Garza, a detention service officer with the INS, conducts counseling and orientation sessions for newly detained aliens at the Los Fresnos detention center. Garza testified at trial in 1986 that he was not familiar with the *Orantes* injunction. Carlos Loya, a detention service officer at El Centro, testified that he received instructions from his supervisor to offer voluntary departure to detainees who had already rejected voluntary departure and requested a deportation hearing.

There is, in short, a large volume of evidence in this record from both class members and INS agents documenting INS practices after the preliminary injunction was entered, including many episodes in which members of the plaintiff class experienced direct interference with their ability to apply for asylum.

The government's focus is not on the evidence of actual events, but rather on a claimed lack of statistical evidence to support the district court's finding "30" that the "vast majority of Salvadorans apprehended sign voluntary departure agreements...." *Orantes II*, 685 F.Supp. at 1494, finding 30. The government does not dispute that this finding accurately describes the situation before the preliminary injunction but claims that it is not accurate with respect to the post-injunction era. The government, however, offers no evidence to refute its continuing accuracy.

The finding, when read in context, describes the situation throughout the litigation. The government stipulated in a pretrial statement that, according to INS statistics for the period 1980 to April 1982, the majority of Salvadoran refugees who were arrested opted for voluntary departure. We do not find any basis for holding finding 30 to be clearly erroneous in the post-injunction period in light of the volume of evidence of the INS's conduct and plaintiff class members' experience after entry of the preliminary injunction. We cannot fault the plaintiffs for failing to produce exclusively post-injunction statistical evidence which the INS itself apparently did not maintain and has not produced.

In sum, the record consisting of evidence from both members of the plaintiff class and INS agents during the post-injunction period fully supports the district court's findings that there was continued INS interference with plaintiff class members' exercise of their right to apply for political asylum.

We agree with the government that injunctive relief is designed to deter future misdeeds, not to punish past misconduct. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953); *Loya v. INS*, 583 F.2d 1110, 1114 (9th Cir.1978). However, a district court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past." *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). Permanent injunctive relief is warranted where, as here, defendant's past and present misconduct indicates a strong likelihood of future violations. *See Green v. McCall*, 822 F.2d 284, 293 (2nd Cir.1987) (permanent injunctive relief appropriate in light of U.S. Parole Commission's repeated failure to comply with preliminary injunction and with its own procedures in past); *United States v. An Article of Drug*, 661 F.2d 742, 747 (9th Cir.1981) (permanent injunction proper because appellant continued to distribute drug despite jury's finding that it had no "safe and effective use"). The record does not support the government's contentions that there were material changes in circumstances making the entry of the permanent injunction unnecessary.

## VI. The District Court's Findings With Respect to INS Interference With the Right to Counsel

 The permanent injunction dealt not only with the right to apply for asylum, but also with the related right to consult with counsel. The INA provides aliens a right to be represented by counsel at no expense to the government. *See* INA § 292, 8 U.S.C. § 1362 (1988). Regulations adopted to effectuate this section require INS officials to notify aliens of their right to counsel and the availability of free legal services programs, 8 C.F.R. § 242.1(c) (1990), and to maintain a current list of such programs and provide the list to aliens, *id.* §§ 292a.1, 292a.2. The regulations also expressly require that juvenile detainees must be given access to a telephone and cannot be presented with a voluntary departure form until they have communicated with a parent, adult relative, friend, or organization on the free legal services list. *Id.* § 242.24(g). *See Perez–Funez v. INS*, 619 F.Supp. 656, 670 (C.D.Cal.1985).

Some of the district court's most detailed findings faulted the government for the nature of the legal services lists provided to Salvadorans, pointing out that many did not contain accurate telephone numbers and that many of the offices were not located in the vicinity where the alien was being detained. *See Orantes II*, 685 F.Supp. at 1497–98, finding 67. Further, the district court found that the lists were not always provided or available to aliens during processing and that the INS routinely failed to make these lists available at detention centers. *See id.* at 1498, findings 71–72. These findings are also fully supported by testimony from many of the class members.

Efrain Antonio Mendez was apprehended in March of 1985 and questioned on a bus while en route from San Ysidro to Chula

Vista. He was not given the list of free legal services until his second immigration hearing which took place approximately two months after his apprehension. After Juan Antonio Mendoza–Chavez was arrested in 1986, INS agents gave him a free legal services list. The agent, however, marked two telephone numbers out of the eight on the list and told Mendoza–Chavez those were the only ones working. Eriberto Reyes Palacios, apprehended by INS in 1985, was told by an agent that he could get an attorney if he had money. Palacios was not given the list of free legal services until he had an immigration hearing. Palacios tried calling the numbers on the list but no one ever answered the telephones; Palacios never obtained an attorney.

Several immigration advocates undertook investigations to determine the accuracy of the legal services lists. The testimony of Juan Rascon provides but one example of the result of these investigations. Rascon found that of the eight organizations on the Arizona district's list, one had gone out of business a year before, three had no phone numbers listed, and one out-of-state organization's phone number was listed but not the area code. Of the two organizations Rascon was able to contact, neither represented Central Americans in asylum proceedings.

The government does not dispute the substance of these findings, but argues that the findings are "premised on a mistaken view of INS's legal obligations" because the pertinent regulation, 8 C.F.R. § 292a.2, requires only that INS provide lists containing organizations that provide "free legal services to indigent aliens." The government asks us to excuse the inaccuracies in the lists because legal services organizations typically do not inform INS of their changes in address, and the government asks us to find that INS had valid reasons for not including certain organizations on the list.

The government's contentions miss the mark. The district court's findings with respect to the legal services lists were but part of a series of findings which went to the ability of Salvadorans to exercise their constitutional and statutory right to counsel at non-government expense. These findings show that the faulty lists were but the first of numerous obstacles, the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice. Most of the findings are undisputed.

For example, the district court found that INS agents did not allow Salvadorans to consult with counsel before signing for voluntary departure. *See Orantes II,* 685 F.Supp. at 1495, finding 43. This finding is supported by the testimony of class members. Jose Sanchez Flores was given a voluntary departure form to sign. When he asked to see an attorney, the agents ignored his request and pointed to the signature line demanding that he "sign it." Manuel de Jesus Umana Fiallos asked to speak with an attorney upon being asked to sign for voluntary departure. The agents would not allow him to call an attorney and pressured him to sign the forms by saying "sign it, sign it." Umana Fiallos refused to sign the forms and was not allowed to call his attorney until the questioning was completed. Luis Renato Canjura was asked by an INS agent if he was going to "cooperate or not" by signing a voluntary departure form. When Canjura asked for an attorney, the agent told Canjura that he could get himself a thousand attorneys but it would be "useless" because no one was going to get him out of detention, so he was better off cooperating. The agent later allowed Canjura to make a phone call, but only after Canjura had promised to sign the voluntary departure form.

The court also found that aliens were frequently detained far from where potential counsel or existing counsel were located. *See Orantes II,* 685 F.Supp. at 1500, finding 87. The government does not challenge this finding. The district court found that limited attorney visitation hours at several detention centers, long delays in bringing detainees to interviews, the inadequacy of systems used to apprise detainees of the presence of their attorneys, and INS's inadequate efforts to ensure the privacy of both in-person and telephonic attorney-client interviews interfered with the at-

torney-client relationship. *See id.* at 1501, findings 102–03. These findings are not challenged.

The government does challenge the district court's finding that INS routinely does not notify attorneys that their clients have been transferred. *Id.* at 1500, finding 94. Our review of the record leads us to conclude that the testimony in support of this finding is substantial.

Formal representation of an alien does not occur until counsel files a Form G–28, "Notice of Entry of Appearance as Attorney or Representative," with the INS. A number of immigration advocates testified that clients for whom they had filed Form G–28 were frequently transferred to remote detention centers without any notice to counsel. These include Bruce Bowman, Juan Rascon, Rudy Aguirre and Nancy Boye. Even Mark Silverman, on whose testimony as to INS's notification policy the government places great weight, testified that he had two clients transferred and then subsequently deported even though he had Form G–28's for them.

The situation in this case, therefore, differs dramatically from that in *Committee of Central American Refugees v. INS,* 795 F.2d 1434 (9th Cir.1986), *amended,* 807 F.2d 769 (9th Cir.1987) (hereinafter *"CRECE"*). In *CRECE* we affirmed the district court's denial of a preliminary injunction prohibiting the INS from transferring Salvadorans and Guatemalans out of the San Francisco district. We found the district court did not err in concluding that the class did not have a fair chance of success on the merits because the evidence in that record showed that plaintiffs' transfers did not interfere with established attorney-client relationships. *Id.,* 807 F.2d at 770. Here, the plaintiffs have shown, and the district court has found such interference.

There were, in addition, extensive findings in this case on access to libraries and legal materials which are also not disputed. The district court found that detainees have no meaningful access to basic written legal materials, that the INS confiscated legal materials provided detainees by coun-

sel or refugee organizations, that neither processing centers nor detention facilities had comprehensive law libraries, either in English or Spanish, and that the use of writing materials was restricted or banned at a number of detention facilities. *See Orantes II,* 685 F.Supp. at 1501–02, findings 105–109, 111.

The only finding on access to legal materials the government directly disputes is that the INS acted in bad faith by rejecting offers to provide detention center libraries with legal materials prepared by refugee organizations and at no cost to the government. *Id.* at 1501–02, finding 106. The conduct is not disputed. The finding of bad faith is a fair inference drawn by the district court from the uncontroverted evidence before it.

With respect to telephones, the district court found that processing officers deny class members access to telephones until after processing, and that despite the preliminary injunction in this case, INS continues to process aliens at locations where telephones are not available to them. *See id.* at 1497, findings 65–66. It also found detainee access to telephones at eight detention centers was severely limited due to time restrictions, the number of functioning telephones and restrictive INS procedures; that detained Salvadorans experienced difficulty reaching counsel when using collect call telephones; and, that the system of informing detainees of attorneys' phone calls was not reliable. *See id.* at 1502, finding 112.

The government does not dispute the fact that aliens are not provided access to telephones at some processing centers, but only challenges its significance. Telephones are important in detention centers because, given the pattern of INS misconduct, the only opportunity the alien may have to learn of rights and options in lieu of voluntary departure is by contacting an attorney or relative. The government makes no challenge to the other findings regarding telephones.

In sum, the record demonstrates that the provisions of the district court's injunction designed to ensure access to counsel were

appropriate remedies for a pattern of practices which severely impeded class members from communicating with counsel.

## VII. The Government's Other Challenges

The government makes a number of other contentions, apart from the claims that the district court's findings were clearly erroneous.

 The government faults the district court for adopting many of the plaintiffs' findings "essentially word for word." However, there is no legal infirmity in the district court's so doing. As the government concedes, even when the trial judge adopts proposed findings of facts verbatim, those findings may be reversed only if clearly erroneous. *See* Fed.R.Civ.P. 52. *See also Anderson v. City of Bessemer*, 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *L.K. Comstock & Co., Inc. v. United Eng. & Constructors, Inc.*, 880 F.2d 219, 222 (9th Cir.1989). As shown above, the findings here are not clearly erroneous.

Moreover, the district court did not accept the findings verbatim, but made material changes in the findings. Of the court's 118 factual findings, 10 were not proposed by the plaintiffs in any form and an additional 37 were modified, some substantially. The district court also materially reorganized the findings as presented by plaintiffs. These deviations indicate the district court did not uncritically accept plaintiffs' proposals. *See Anderson*, 470 U.S. at 572–73, 105 S.Ct. at 1510–11; *L.K. Comstock & Co.*, 880 F.2d at 222. There is no basis for reversing the court's decision due to the form of the factual findings.

 The government also contends that the district court improperly relied upon testimony of a psychologist on the distinctive personality traits of Salvadorans. Such testimony was relevant and material only to the extent that it tended to show that a substantial number of Salvadorans feared return and did not understand asylum principles. The findings of the district court to that effect are more than adequately supported by other evidence in the record discussed in Part V(B) of this opinion.

The government also challenges the injunction on the ground that it is "country specific" in that it is directed to the INS's treatment of aliens from El Salvador. This limitation on the scope of the injunction results from the identity of the plaintiff class and not from any improperly restrictive interpretation of the INA.

 A final government contention concerns testimony from lawyers of their experiences in attempting to assist Salvadoran aliens in applying for asylum. The government challenges some of this evidence as hearsay, particularly the evidence of statements by the aliens to their attorneys of what the aliens had in turn been told by INS agents. Such evidence would be hearsay if admitted for the truth of the statements and relied upon by the district court for that purpose. The record reflects, however, that the district court was well aware that the testimony would be inadmissible for that purpose, and its findings give no indication that it relied upon this evidence for the truth of the matter asserted. Indeed, the testimony was not needed to show INS coercion, since the record is replete with non-hearsay evidence that supports the district court's findings as to the conduct of the agents, including their own testimony. *See* Part V(A) & (B). Most of the attorneys' testimony related to their own experiences in attempting to contact, interview and represent their clients in the face of conduct amounting to obstruction on the part of the INS. This testimony was not hearsay and there was certainly no abuse of discretion in admitting it.

## VIII. Conclusion

After careful study of the record in this case based upon the government's challenges to the district court's findings of fact, we conclude the challenged findings are not clearly erroneous. The district court's entry of this injunction, which makes permanent the preliminary injunc-

tion entered in 1982, was not an abuse of discretion.

AFFIRMED.